The **DEARBORN COMPANY**

v.

The **UNITED STATES.**

The **DEARBORN COMPANY** et al.

v.

The **UNITED STATES.**

Nos. 12–67, 13–67.

United States Court of Claims.

June 11, 1971.

---

Benjamin M. Brodsky, Chicago, Ill., attorney of record, for plaintiffs; Gottlieb & Schwartz, Chicago, Ill., of counsel.

E. Alan Moorhouse, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

These cases were referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on February 19, 1971. No exceptions to the commissioner's findings, opinion and recommended conclusion of law have been filed by the parties and the time for so filing under the Rules of the court and an extension of time granted to plaintiffs for such purpose has expired. On May 3, 1971, defendant filed a motion for judgment requesting that the court adopt the commissioner's report as the basis for its judgment in the cases.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases, without oral argument. Therefore, plaintiffs are not entitled to recover and the petitions are dismissed.

## OPINION OF COMMISSIONER

### DAVIS, Commissioner:

These consolidated cases [1] raise, once again, the troublesome issue of whether a loss incurred on the sale of corporate stock is to be treated for income tax purposes as a capital loss or as a loss against ordinary income. That issue was recently dealt with by this court in Waterman, Largen & Co. v. United States, 419 F.2d 845, 189 Ct.Cl. 364 (1969), and FS Services, Inc. v. United States, 413 F.2d 548, 188 Ct.Cl. 874 (1969), and was earlier considered in Booth Newspapers, Inc. v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962). Those cases and similar ones decided by other Federal courts are in large measure the progeny of Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L. Ed. 29 (1955), wherein the Supreme Court dealt with the question of what is a "capital asset" under § 117 of the 1939 Internal Revenue Code (comparable to § 1221 of 1954 Code). As a general rule, corporate stock has been held to be

---

1. The Dearborn Company ("Dearborn") is the principal plaintiff and will hereafter be referred to as "plaintiff." Badger Lumber and Manufacturing Company ("Badger") and The Freeman Company ("Freeman") are affiliated with Dearborn and are coplaintiffs because Dearborn, Badger and Freeman filed a consolidated tax return for the year 1957, one of the years in issue.

a "capital asset" within the meaning of the Code because such stock is "property" and does not come within any of the exceptions expressly set out in § 1221.[2] However, the courts have carved out an exception to this general rule, which is succinctly stated in the *Booth Newspapers* case, *supra*, 303 F.2d at 921, 157 Ct.Cl. at 896:

> * * * if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

Thus, the circumstances of the transactions (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and the time they were disposed of) are of crucial importance in the resolution of these cases. * * *

In 1946, plaintiff, a furniture company, acquired 75,000 shares of common stock of Munising Wood Products Company, Inc. ("Munising Delaware"), for $150,000. Munising Delaware was a woodworking company which produced, among other things, kiln-dried lumber and furniture dimension parts. It also manufactured a wide variety of finished wood products which it sold to consumers through various outlets. In 1957 and 1958, plaintiff acquired an additional 7,802 shares of Munising Delaware stock for $5,393.38, making a total investment of $155,393.38 (82,802 shares). In 1960, plaintiff sold all the stock for $4,140.10, thus incurring a loss of $151,253.28.

In essence, plaintiff says the loss should be treated as a loss against ordinary income because it purchased the stock in the ordinary course of business, and as an integral and necessary act in the conduct of its furniture business, in order to get management control of the production and supply facilities of Munising Delaware, including a 4½-year contract for supplies of hardwood timber. In 1946, wood raw materials, particularly hardwood, were in short supply. Plaintiff further says that during the years it held the stock (14 years for the 75,000 shares and 2–3 years for the 7,802 shares), it did so, not for investment purposes but rather as incident to its

2. Sec. 1221. Capital asset defined.
   For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
   (3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or
(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;
(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or
(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

business needs for wood supplies; and that when it disposed of the stock in 1960, Munising Delaware was no longer in the wood products supply business and thus was of no further use to plaintiff.

Defendant, on the other hand, contends that plaintiff acquired the stock (in 1946 and 1957–1958) with substantial investment purpose and intent and continued to so hold the stock until its disposition in 1960. Defendant does not seriously quarrel with the fact that, in 1946, wood raw materials were in short supply and that Munising Delaware was a valuable adjunct to plaintiff's furniture business. Defendant simply says that plaintiff's reasons for acquiring the stock (and management control) of Munising Delaware ran deeper than just alleviating a shortage of raw materials. In particular, defendant says that plaintiff acquired the stock as a permanent investment with a view to increasing its own business, managing Munising Delaware's business for fee income, receiving dividends from Munising Delaware stock, and sharing in potential capital growth of Munising Delaware's business of selling a wide variety of wood products.

In light of the accompanying detailed findings of fact and for the reasons stated in the ultimate findings and conclusions, I am constrained to hold that, while the case is a close one, defendant's position is correct. In 1946, Munising Delaware (or, more accurately, its predecessor, Munising Michigan) was a profitable woodworking business, making many and diverse products. The record shows without doubt that, although plaintiff was particularly interested in using Munising Delaware as a source of wood raw materials for plaintiff's furniture business, it also aimed to operate and manage Munising Delaware as an investment and to continue Munising Delaware's profitable business of manufacturing and selling wood products other than those needed in plaintiff's furniture business. Thus, when plaintiff acquired the stock (and management control) in 1946, it intended to operate Munising Delaware as a permanent, profitable business in its own right (which it did for several years); to receive dividend income from Munising Delaware stock (which it did in the amount of about $132,000); and to make fee income from managing Munising Delaware (which it did in the amount of $581,954.75).

In short, the record establishes that plaintiff, in acquiring Munising Delaware stock, was motivated by substantial investment purpose and intent, even though an important purpose was for business reasons of supply and production facilities; and under the decided law in this area, the presence of substantial investment purpose and intent is fatal to plaintiff's case. Accordingly, plaintiffs' petitions should be dismissed.

## FINDINGS OF FACT

1. These suits are for the recovery of corporate income taxes, paid by plaintiffs under the Internal Revenue Code of 1954, as follows:

| Calendar year | Amount |
|---|---|
| 1957 | $46,576.22 |
| 1958 | 2,109.88 |
| 1964 | 6,563.37 |

2. Plaintiff, The Dearborn Company ("Dearborn"), is an Illinois corporation with its principal office at 666 Lake Shore Drive, Chicago, Illinois. Plaintiff, Badger Lumber and Manufacturing Company ("Badger"), is a Wisconsin corporation with its principal office at 234 Campbell Road, Oshkosh, Wisconsin. Plaintiff, The Freeman Company ("Freeman"), is an Illinois corporation with its principal office at 666 Lake Shore Drive, Chicago, Illinois.

3. Plaintiffs timely filed a consolidated Federal income tax return for 1957 with the District Director of Internal Revenue at Chicago, Illinois ("District Director"), and reported and timely paid tax of $50,006.07. Pursuant to deficiencies asserted by the District Director,

plaintiffs subsequently paid additional tax and interest for 1957, as follows:

(a) On or about June 2, 1960, $2,392.-25, plus $304.93 interest.

(b) On or about June 1, 1962, $1,807.-03, plus $116.82 interest.

Overassessment in income tax for 1957 was also determined by the District Director in the amount of $7,629.13, which was refunded to plaintiffs. Thus, the net income taxes paid by plaintiffs for 1957 were as follows:

| | |
|---|---|
| Taxes originally paid | $50,006.07 |
| Taxes paid pursuant to asserted deficiencies | 2,392.25 |
| | 1,807.03 |
| | 4,199.28 |
| Gross taxes paid | 54,205.35 |
| Previously refunded | 7,629.13 |
| Net taxes paid | 46,576.22 |

4. On or about March 13, 1964, plaintiffs filed with the District Director a timely claim for refund of Federal income tax for 1957 of $46,576.22, plus interest as provided by law. On June 10, 1966, the District Director proposed to disallow the claim; and a petition was thereafter timely filed in this court seeking refund.

5. Dearborn timely filed a Federal income tax return for 1958 with the District Director, and reported and timely paid tax of $13,285.70. Subsequently, the District Director asserted a deficiency of $1,277.93, which Dearborn paid on or about June 1, 1962, plus interest of $212.33.

6. On or about March 13, 1964, Dearborn filed with the District Director a timely claim for refund of Federal income tax for 1958 in the amount of $14,-563.63, plus interest as provided by law. Subsequent to March 13, 1964, Dearborn received a refund of Federal income taxes for 1958 of $12,453.75, leaving an unrefunded balance of $2,109.88. On June 10, 1966, the District Director proposed to disallow the claim; and a petition was thereafter timely filed in this court seeking the unrefunded balance.

7. Dearborn timely filed a Federal income tax return for 1964 with the District Director, and reported and timely paid tax of $2,712.16. Subsequently, the District Director asserted a deficiency of $8,189.51. Dearborn does not dispute the correctness of $1,626.14 of the deficiency, which Dearborn paid, with interest of $105.59, on July 29, 1966. The remainder of the deficiency, $6,563.-37, was paid on September 2, 1966. Interest thereon of $557.31 was paid on September 30, 1966.

8. On or about September 6, 1966, Dearborn filed with the District Director a timely claim for refund of Federal income tax for 1964 of $6,563.37, plus interest paid thereon of $557.31, plus interest as provided by law. On September 29, 1966, the District Director disallowed the claim; and a petition was thereafter timely filed in this court seeking refund.

9. No action on any of the claims for refund here involved, other than as mentioned above, has been taken before the Congress of the United States or before any department of the Government. Plaintiffs are and always have been the sole owners of the claims. No transfer or assignment of any of the claims, or any part thereof, has ever been made.

10. The claims for refund here asserted stem from a loss of $151,253.28 sustained by Dearborn in 1960 on the sale of its shares of common stock of Munising Wood Products Company, Inc. ("Munising Delaware"). Plaintiffs contend that the loss gave rise to an ordinary loss deduction for 1960, which resulted in a net operating loss for 1960, and also in net operating loss carrybacks to 1957 and 1958, and a net operating loss carryover to 1964, thus resulting in overassessments of Federal income tax for each of the 3 years involved. Defendant, on the other hand, contends that the loss should be treated as a capital loss.

11. By pretrial stipulation, the parties agreed to limit the trial on liability

to the issue of plaintiffs' right to recover on the loss attendant to the sale of the Munising Delaware stock. Fact and legal issues relating to net operating loss carrybacks and carryovers are deferred to proceedings under Rule 131(c), including, but without limiting the generality of the foregoing, the allegation that Dearborn's separate taxable income for 1957 exceeded the amount of the net operating loss carryback from 1960 to 1957.

12. Dearborn, at all times relevant, sold furniture in the United States and Canada to retail outlets, including furniture stores, mail order houses and chain-stores. Its customers included Sears Roebuck, Montgomery Ward, Woolworth, Gimbels, May Company, and Emporium. Dearborn does not manufacture furniture.

13. (a) Badger is a wholly-owned subsidiary of Dearborn. At all relevant times, it manufactured furniture for Dearborn to sell. Badger conducted a complete manufacturing operation, including machining, assembling, sanding, finishing, and packaging furniture in cartons.

(b) In the early 1940's, Dearborn sold, and Badger made, primarily low-priced breakfast set furniture out of oak and elm. The market for such furniture declined in the early 1940's; and to stay in business, Dearborn decided to switch to Early American furniture, made from high-quality hard maple and birch.

14. Badger's operations to make wood furniture are as follows: After boards (lumber) are kiln-dried and cured, they are cross-cut to rough length and ripped to width. For laminated pieces, such as table tops, the edges are specially prepared for lamination and gluing. All pieces, both glued and unglued, are then planed. Thereafter, pieces which require shaping, such as table and chair legs, are shaped by a knife, or sawed, or turned on lathes. The pieces are sanded for finishing, assembled, and the completed items of furniture are then finished.

15. Badger owned no timberlands and had no sawmill. It began its manufacturing process with lumber purchased from outside sources, then processed the lumber through its kiln-drying facilities. The purpose of kiln-drying is to remove natural moisture from lumber to a point where the lumber is usable for making indoor furniture. Though Badger had four dry kilns which are large rooms lined with steam-carrying pipes, it could not kiln-dry all the lumber it needed. It therefore bought additional kiln-dried lumber from outside sources to provide all the lumber required by its fabricating department when in full operation.

16. Badger also had limited machining and fabricating facilities. Therefore, it purchased some of its dimension parts (also called dimension stock) from outside sources. Dimension parts are prefabricated wood pieces, such as chair and table legs, which are either of rough dimension or finished dimension. A rough dimension part is one which has been cross-cut to rough length and ripped to rough width. It is a rough size of the finished part and is suitable for shaping, planning and sanding to finished size. Badger particularly bought rough dimension parts for table and chair legs, because such parts are relatively thick and are less economical to kiln-dry than thinner lumbers. That is to say, it was more economical for Badger to use its limited kiln-drying facilities to dry thin lumbers than rough dimension parts.

17. In short, Badger was an unbalanced factory. Its productive capacity was like an inverse funnel. It had more capacity as each step of its operation moved forward. Its smallest capacity was the dry kilns whose output could supply about 30–50 percent of its total productive capacity. The second smallest capacity was its rough cutting room. Its third smallest capacity was the finished machining operation. The final assembling and finishing operations represented its maximum capacity. Thus, to achieve the maximum economic benefit of a balanced operation, Badger had to

(a) buy kiln-dried lumber to supplement its own kiln capacity, (b) buy rough dimension parts to supplement the cutting capacity of its rough mill, and (c) buy finished dimension parts, i. e., fully machined or turned parts, to supplement its own production of machined parts.

18. Dimension stock is ordered during the two logging seasons—winter and summer. The potential user shops the suppliers to find out the availability of kiln-dried lumber from which dimension stock is made. The buyer specifies the sizes, moisture content and quality. Sixty to ninety days are required for dimension mills to cut logs into lumber, dry it and make it into dimension stock.

19. Prior to 1946, Badger had difficulty getting lumber. During World War II, lumber for making civilian goods was in short supply since most of it went to Government priority work. Badger made some furniture for the Government, for which it got lumber on priority. Also, Badger had encountered a recurring problem of getting dimension stock. Arthur L. Margolis, then executive vice president of Dearborn and engaged in purchasing and supervising production, spent about half of each year visiting suppliers to get dimension stock.

The evidence does not establish to what extent Dearborn, prior to 1946, was required to curtail its business due to Badger's unbalanced manufacturing facilities and difficulties getting raw materials.

At the end of World War II when civilian production resumed throughout the country, Badger's supply problems became aggravated. By then, Badger had switched into making principally hardwood furniture. The demand for wood, particularly furniture-grade hardwood, increased substantially. Margolis continued to travel extensively seeking supplies, particularly dimension stock. Badger's net purchases of supplies increased in 1946 to $1,205,804 from $552,-887 in 1945, reflecting post-World War II economic growth common to much of American industry. Likewise, Dear-

born's net sales increased from $1,296,259 in 1945 to $2,158,776 in 1946. Dearborn, as a selling organization, had a sales potential about three times greater than Badger's maximum manufacturing capacity; and Badger was unable to fill all of Dearborn's needs for furniture.

20. In September 1944, Dearborn's board of directors authorized negotiations for the purchase of a dimension lumber plant and sawmill at Tygart, West Virginia, owned by the National Housing Authority of the United States. The plant had no timberlands of its own. Margolis and Max Nunemaker, an engineer previously employed as a consultant to Dearborn and in 1944 an employee of Munising Wood Products Company, Inc. ("Munising Michigan"), investigated the prospective purchase. The price was $750,000. Since Dearborn did not have the money to make the purchase, Margolis discussed financing with a bank, but was turned down. Though the plant had only a limited amount of equipment, mostly for making rough dimension stock, Nunemaker thought the plant "could produce dimension stock, if that's what they [Dearborn and Badger] were after," and he so reported to Joseph F. Robineau, president of Dearborn. Robineau thought the price of $750,000 was too high. In the minutes of a special meeting of the board of directors of Dearborn, held on June 28, 1946, the following appears:

Mr. Robineau advised the Directors that in September of 1944, the Directors had authorized negotiations for the purchase of a dimension lumber plant and sawmill located at Tygart, West Virginia, and owned by the National Housing Authority of the United States Government. He stated that it appeared the Government expected to obtain at least $750,000 for the plant and inventories and that the property was not in his opinion worth that price to Dearborn, although the matter would be followed with the thought of purchasing only if the price was greatly reduced.

Dearborn did not purchase the plant; and so far as the record shows, it did not further negotiate for its purchase after 1944.

21. One of Badger's suppliers, prior to August 1946, was Munising Michigan, a Michigan corporation. Badger was one of Munising Michigan's largest, if not its largest, customers for dimension stock. However Munising Michigan could not supply all of Badger's needs and would not fill all of Badger's orders for several reasons: Munising Michigan did not want to sell too heavily to any one customer; not all of Badger's orders permitted proper utilization of lumber available to Munising Michigan; and Munising Michigan wanted to balance its production of wood items so to take advantage of high-profit items, such as agricultural machinery parts. Prior to 1946, Badger also bought dimension stock from suppliers other than Munising Michigan. It is not clear from the record what quantities or percentages of its dimension-stock needs Badger bought from its various suppliers.

22. Munising Michigan was a wholly-owned subsidiary of Cleveland-Cliffs Iron Company, an Ohio corporation ("Cleveland-Cliffs"). Munising Michigan sold exclusively lumber and wood products. It owned two plants, a large one at Marquette, Michigan, and a smaller one at Munising, Michigan.

(a) The Marquette plant was a large woodworking plant with a bandsaw mill capable of cutting about 50,000 board feet of lumber per day (12.5 million board feet per year). The mill was as large as any in the Upper Peninsula of Michigan. It had standard woodworking machinery for cross-cutting, ripping, shaping, turning, boring, gluing, sanding, and finishing various wood articles. The machining and finishing facilities were balanced to absorb the output of the sawmill. The plant had dry kilns for holding about 220,000 board feet of lumber. By comparison, Badger's dry kilns held about 70,000 board feet. The plant produced rough lumber for resale and it made wood parts (*e. g.*, dimension stock) for other customers, such as furniture manufacturers, farm equipment manufacturers, etc. It also made finished parts, such as handles, knobs, bearings, etc., for incorporation by other manufacturers into commercial products. About 95 percent of its products were made from hardwood (birch and hard maple).

(b) The Munising plant produced exclusively consumer products, such as kitchenware, salad bowls and clothespins. It had a sawmill with a daily capacity of about 32,000 board feet of lumber (about 8 million board feet per year). Its dry-kiln capacity was about 20,000 board feet of lumber, about one-tenth of the Marquette plant and about one-third of Badger. Its equipment was standard and special woodworking machinery necessary to make its product line. Some of its consumer products were made from lower grades of lumber and from lumber slabs not otherwise salable at a profit. The consumer products were sold to jobbers, mail order houses and chainstores.

(c) The Marquette plant was about 200 miles from Badger's plant at Oshkosh, Wisconsin. This was no further than other plants which supplied Badger with lumber, but was closer than some of Badger's suppliers of dimension stock which were as far away as 700–1,000 miles. The Munising plant had some equipment which was better than Badger's for economically making certain parts, particularly spindles for chair backs.

23. Cleveland-Cliffs owned one of the largest, if not the largest, stands of hardwood timber in Michigan's upper peninsula. The timber was in the vicinity of the Marquette and Munising plants.

24. In 1946, Max Nunemaker was general manager and vice president of Munising Michigan, which positions he had held since June 1941. Nunemaker was familiar with the operations of Dearborn and Badger, having done consulting work for them as early as 1928. Nunemaker advised Margolis of Dearborn, sometime before mid-1946, that Munising Michigan was for sale for

about $1,500,000. Dearborn did not have the funds to make such a purchase. However, Joseph Robineau of Dearborn contacted MacMerrill Birnbaum, an investment banker, who suggested that he (Birnbaum) might be able to arrange the financing necessary for the purchase of Munising Michigan. Robineau then entered into preliminary negotiations with certain NewYork bankers through Birnbaum. A group of bankers, headed by American Securities Corporation, expressed interest in investing with Dearborn in the acquisition of Munising Michigan stock. All this, and the details of the proposed arrangement of stock acquisition, are set out in the minutes of Dearborn's board of directors' meeting held June 28, 1946, as follows:

\* \* \* \* \* \*

Mr. Joseph F. Robineau further stated that both The Dearborn [Company] and its wholly owned subsidiary, the Badger Lumber & Manufacturing Company, have for years dealt with Munising Wood Products Company, a Michigan corporation, which company owns two manufacturing plants, one located at Munising, Michigan, where various kitchenware items are manufactured, and one at Marquette, Michigan, where wooden handles and furniture dimension parts are manufactured, and that each plant is equipped with a mill to saw lumber, both for its own use and for sale to others; that Cleveland Cliffs Iron Company is the owner of all of the capital stock of the Munising Company and desires to liquidate its holdings in the Company.

Mr. Robineau further stated that one of the prime difficulties which both The Dearborn Company and Badger Lumber & Manufacturing Company had encountered in recent years was the problem of obtaining an adequate supply of maple and birch lumber; that he was informed that in event of a sale of the Munising Company by Cleveland Cliffs Iron Company, the latter company, which owns one of the few remaining substantial quantities of hardwood forest land, would contract with the Munising Company to supply substantial amounts of this scarce hardwood timber for a period of years, provided the contract were guaranteed by some company or companies whose requirements of this type of lumber were such as to assure disposal by Munising of the amount contracted for, and that he believed the guarantee of The Dearborn Company would be accepted.

Mr. Robineau further stated that for the year ended December 31, 1945, the Company realized a net profit before Federal taxes of $228,853.40 and with net profit after Federal taxes of $79,-691.54; that he was informed that Cleveland Cliffs Iron Company was asking approximately $1,600,000 for all the stock of the company and that obviously this was much more than The Dearborn Company alone could afford to invest in the company, even though great benefits would be derived from the ownership. However, Mr. Robineau stated that he had preliminary negotiations with New York investment bankers and that this group is interested in investing with The Dearborn Company in acquisition of the stock of the Munising Company, and that it is tentatively proposed that a new corporation be organized, preferably under the laws of Delaware, having an authorized capital consisting of 50,000 shares of $10 par value convertible preferred (each share being convertible into 2½ shares of common) and 400,000 shares of common stock; that the investment bankers would acquire the 50,000 shares of preferred at par and 125,000 shares of the common stock at $2.00 per share, and that The Dearborn Company, together with such individuals as Dearborn might interest, would acquire 125,000 common shares at $2.00 per share; that The Dearborn Company would guarantee the hardwood log contract to be entered into between Munising Wood Products Company and Cleveland Cliffs Iron Company, and that Dear-

born would receive an option for three years to acquire 25,000 additional shares of the common stock of the proposed corporation at a price of $3.00 per share, the remaining 125,000 shares of common stock of the new proposed corporation would be held for conversion of the preferred stock. The new proposed corporation would then purchase all of the stock of Munising Wood Products Company and pay for the stock in cash by borrowing a sufficient sum to complete the cash requirement; that every effort would be made to acquire the stock for approximately $1,500,000. It was believed that Cleveland Cliffs Iron Company might accept such a cash offer.

Mr. Robineau stated that the banking group would insist on the right to name three out of five directors and The Dearborn Company and associates would name two, but stated that he believed said group would agree that The Dearborn Company be named as a manager of the new company, and thus The Dearborn Company would temporarily, at least, have even greater control over the operations than it would have through a majority of the board.

Mr. Robineau further stated that he believed the bankers, if they acquired the proposed interest in Munising Wood Products Company, would register its holdings and offer the same to the public at some future date and that upon such a distribution being made to the public, it seemed likely that Dearborn's minority interest might well represent practical control of the company.

Mr. Robineau further stated that while he did not think Dearborn could put up $250,000 in cash to acquire shares proposed to be issued to it, he did believe that he could interest people friendly to The Dearborn Company in the deal, to the end that with these people the proposed number of shares might be purchased. Mr. Robineau stated that he would personally be willing to purchase a substantial amount of stock in the new company and that

he believed the other officers, employees and friends of The Dearborn Company might be willing to make fairly substantial investments.

Mr. Robineau stated that if the board of directors approved, he believed it proper to adopt a resolution authorizing him to proceed with these negotiations and, if possible, to enter into on behalf of The Dearborn Company a contract or contracts with the banking group for the purchase of the Munising Company approximately on the terms outlined by him, and that the officers of The Dearborn Company be authorized on behalf of the Company to execute not only any such contract, but, in addition, any guarantee of performance which might be required by Cleveland Cliffs Iron Company in connection with the purchase of the stock by the proposed new company and any guarantee of performance of the timber contract proposed to be entered into between Munising Wood Products Company and Cleveland Cliffs Iron Company.

Thereupon, on motion, duly made, seconded and unanimously carried, the following resolution was adopted:

BE IT RESOLVED that Joseph F. Robineau, President, and Arthur L. Margolis, Executive Vice President of this Company, be, and they are hereby, authorized and directed on behalf of this Company, in association with New York investment bankers, to negotiate with Cleveland Cliffs Iron Company for the purchase of all of the capital stock of Munising Wood Products Company, a Michigan corporation, at an aggregate price of $1,500,000; and

BE IT FURTHER RESOLVED that said Joseph F. Robineau and Arthur L. Margolis be, and they are hereby, authorized for and on behalf of this Company to negotiate and execute a contract or contracts with the New York banking group for the acquisition of such stock; for the formation of a new company to acquire the same, and an agreement as to the voting and sale of the shares acquired by the parties

to the agreement, and do hereby authorize said Joseph F. Robineau and Arthur L. Margolis on behalf of The Dearborn Company to subscribe or contract for the purchase of 125,000 shares of common stock of said proposed corporation at $2.00 per share; and

BE IT FURTHER RESOLVED that said Joseph F. Robineau and Arthur L. Margolis, or either of them, be, and they are, authorized to execute on behalf of and in the name of The Dearborn Company a guarantee of any timber contract executed by Cleveland Cliffs Iron Company with Munising Wood Products Company, a Michigan corporation, in connection with the said proposed purchase; and

BE IT FURTHER RESOLVED that the officers of this Company be, and they are hereby, authorized to borrow on behalf of this Company, on such terms as they shall deem satisfactory, such funds as they may deem necessary to pay for all shares acquired by this Company.

25.  (a) On July 17, 1946, Robineau and Margolis met with officers of the American National Bank and Trust Company of Chicago ("Bank") to discuss, among other things, borrowing money to purchase a portion of Munising Michigan's stock.  Dearborn requested a 3-year loan for 75 percent of Dearborn's proposed investment of $150,000, provided that the Bank could be furnished with satisfactory evidence of management control of Munising Michigan by Dearborn. A Bank "Officers Memorandum," dated July 17, 1946, noted that Dearborn is "presently giving consideration to the purchase of an interest in * * * [Munising Michigan]"; that Munising Michigan has "current assets of approximately $950,000 and current liabilities of approximately $137,000"; that "they [Dearborn] have an appraisal of this company amounting to $2,000,000"; that the "attractive feature involved in the purchase is that CCIW [Cleveland-Cliffs] are [sic] willing to contract with the purchasers for the delivery of approx-

imately 15,000,000 feet of lumber a year and with this large source of supply the D. Co. [Dearborn] will be in a position to both double its sale and products capacity"; and that Munising Michigan "has engaged since 1940 a production engineer, Mr. Nunemaker who has been responsible for progressively each year increasing the profits of this Co., and will remain with the company if the * * * [Dearborn] people acquire the business."

(b) On July 19, 1946, the Bank agreed to grant Dearborn a loan for 3 years, in the maximum amount of $160,000, or 75% of the price of Dearborn's portion of the Munising Michigan stock, the loan to be secured by the stock so purchased. The loan commitment was subject to Dearborn's "obtaining control of the management" of Munising Michigan; to Dearborn's securing a contract with Cleveland-Cliffs "to provide * * * [Dearborn] with the lumber requirements"; and to Dearborn's maintaining "a minimum working capital of $250,000 during the period of the term loan." The loan was ultimately granted on August 26, 1946.

26.  (a) Late in July 1946, Robineau engaged in further discussions with the American Securities Corporation group, which agreed to undertake the financing of the Munising Michigan purchase. The basis for the purchase was to be the issuance of 250,000 shares of common stock at $2 per share and 50,000 shares of convertible preferred stock at $10 per share. Dearborn and its associates were to buy 125,000 shares of common stock at $2 per share.

(b) A Bank "Officers Memorandum," dated August 3, 1946, stated that Robineau, "(at his own suggestion) will be given a management contract after a 4 months period in which time he anticipates strudying [sturdying? studying?] the situation and revamping the pricing, and, as is natural, eliminating less profitable items and adding profitable items. * * * [American Securities Corporation and Robineau] * * * believe that

the earnings can be increased considerably through proper study and action." The Memorandum further noted that "[Robineau] also informed us the * * [American Securities Corporation] agrees not to sell their position without the consent of * * * [Dearborn], and they also agree that they will offer the same deal to sell at the same terms to * * * [Dearborn], before offering their position to any outsider, or participate equally with * * * [American Securities Corporation]. [American Securities Corporation] * * * also agreed not to recapitalize, merge or sell any part of the stock without the consent of * * * [Dearborn]. * * * [Robineau] stated that Mr. Nunemaker who now manages * * * [Munising Michigan] is an excellent man, and has requested a minimum of 15,000 shares to be purchased for $30,000.00. Mr. Lee Jalkut formerly with Montgomery Ward has indicated his desire to purchase a minimum of $25,000 worth of the common stock and would prefer up to $50,000, however, he can only pay for $25,000 at this time. Mr. G. N. Kelly merchandising manager in the Dearborn organization also desires to purchase stock in the company in the minimum of $10,000. * * * [American Securities Corporation] believes that this common stock can be sold at the present moment for a minimum $4.00 a share but anticipates that after the 6 months period of earnings, they will be able to market the common stock if they so wish at approximately $6.00 to $8.00 a share. * * * "

The Memorandum also noted that Robineau "was emphatic in telling us that there will be no deal at all unless * * * [Cleveland-Cliffs] furnishes * * * [Dearborn] with a proper lumber contract, guaranteeing to set aside 15,000,000 feet of lumber per year for 3 years under which contract * * * [Munising Michigan] specifically agrees to take a minimum of 10,000,000 feet of lumber out of the 15,000,000 offered. Negotiations are already in progress on this contract." The Memorandum further stated that Robineau "is of the firm opinion that the acquisition of * * * [Munising Michigan] as a source of supply will enable * * * [Dearborn] to increase its sales and production considerably. [Robineau] * * * pointed out to us that * * * [Dearborn], instead of carrying an inventory of $450,000, it will be necessary to carry only an inventory of $250,000, which, as he put it, will eliminate 'hysterical' buying on their part. * * * [Munising Michigan], in addition to milling the lumber also fabricates many items which are in great demand and profitable at this time. In 1945, * * * [Munising Michigan] made a net profit before taxes of $229,000 but upon present basis they should earn $350,000, before taxes, with the careful and experienced management under * * * [Robineau and Dearborn]. * * * [American Securities Corporation and Robineau] believe that * * * [Munising Michigan] can easily earn $1.00 per share on 250,000 shares or even as high as $1.50 per share within a very short period. The basis of this opinion on the part of * * * [Robineau] is that they will change into items which are far more profitable than are some that are now being sold by * * * [Munising Michigan] at a minimum profit."

27. The mechanics of the acquisition of Munising Michigan stock, as ultimately agreed upon and carried out, were as follows. A new corporation, Munising Wood Products Company, Inc. ("Munising Delaware"), was organized under the laws of the State of Delaware; and with funds derived, as described immediately below, it purchased all the stock of Munising Michigan from Cleveland-Cliffs for $1,500,000. Munising Delaware was capitalized with $1,000,000 of stock, consisting of $500,000 for 50,000 shares of preferred stock at $10 per share and $500,000 for 250,000 shares of common stock at $2 per share. Of the $1,000,000, American Securities Corporation and related parties provided $750,000 for all of the preferred shares and 125,000 of the common shares. Dearborn and related parties provided

$250,000 for 125,000 of the common shares. The balance of $500,000 of the purchase price of $1,500,000 was borrowed from the Bank of Manhattan.

28. On August 28, 1946, Cleveland-Cliffs as seller and Munising Delaware as buyer entered into a stock purchase agreement which provided in pertinent part as follows:

(a) Seller agreed to sell and buyer agreed to buy the entire 2,900 shares of issued and outstanding common capital stock of Munising Michigan for $1,500,000.

(b) One of the conditions of the buyer's obligation was that upon closing, seller and Munising Michigan would have entered into a log purchase contract (as set out in finding 29).

(c) Dearborn guaranteed to seller the performance by buyer of the latter's obligations under the agreement.

(d) American Securities Corporation guaranteed the performance by buyer of the buyer's obligations under the agreement, to the extent such obligations arose out of facts occurring during the period when American Securities Corporation and related parties individually or collectively owned 50% of either the common stock or the preferred stock of Munising Michigan.

29. On August 28, 1946, Cleveland-Cliffs and Munising Michigan entered into a log purchase agreement effective September 1, 1946, which provided in pertinent part as follows:

(a) Cleveland-Cliffs agreed to sell and Munising Michigan agreed to buy a minimum of about 40,750,000 feet and a maximum of about 70,750,000 feet of birch, maple, beech, basswood, ash, elm, and oak saw logs of certain diameters and standard log lengths, with at least 80% of the logs to consist of birch and maple.

(b) Delivery of logs was to start September 1, 1946, and to continue as lumbering operations permitted in the amount of about 10,750,000 feet for the period up to March 31, 1947, and thereafter in such amount for each 12-month period beginning April 1, 1947 and ending March 31, 1951, as shall be specified by Munising Michigan, such amount not to be less than 7,500,000 feet nor more than 15,000,000 feet, subject to various contingencies.

(c) The price of the logs was to be a sum equal to the cost of Cleveland-Cliffs for the production and delivery of the logs, plus $1 per thousand feet for forestry expense, plus a total amount for stumpage on such logs as follows:

(i) During the period September 1, 1946 to March 31, 1949:

| Variety | Cost per thousand feet |
|---|---|
| Birch | $30 |
| Hard Maple | 14 |
| Soft Maple | 12 |
| Beech | 9 |
| Basswood | 22 |
| Ash and Elm | 10 |
| Oak | 18 |

(ii) During the period April 1, 1949 to March 31, 1951, fair and reasonable amounts for stumpage, to be agreed to between the parties.

(d) If prior to March 31, 1951, Cleveland-Cliffs should desire to sell its timber, then to the extent that it could not supply to Munising Michigan an additional 30,000,000 feet of such logs over and above the requirements of the contract, Cleveland-Cliffs must offer Munising Michigan the right to buy 30,000,000 feet of timber upon the same terms and conditions as such timber would be sold to others.

(e) Dearborn guaranteed to Cleveland-Cliffs the performance by Munising Michigan of the terms of the contract.

30. Pursuant to the stock purchase agreement noted in finding 28, Munising Delaware, on August 29, 1946, purchased all the stock of Munising Michigan. Dearborn itself purchased 90,000 shares of Munising Delaware stock at $2 per share. Dearborn sold 15,000 of its shares to Nunemaker, in exchange for his note, at its cost ($2 per share), in

consideration for his assistance to Dearborn in making the deal and in consideration for Nunemaker's agreement to stay on as general manager of Munising Delaware. Persons associated with Dearborn purchased 35,000 shares to make up the balance of 125,000 shares to which Dearborn was committed. Dearborn's purchase of 75,000 shares (90,000 less 15,000 sold to Nunemaker) was financed by the Bank loan, noted in finding 25(b).

31. As of the date of its formation, Munising Delaware's issued and outstanding stock was as follows:

50,000 shares preferred stock of the par value of $10 per share.

250,000 shares of common stock of the par value of $1 per share.

The preferred stock, which carried 5% cumulative dividends, was convertible into common stock at any time by any holder on the basis of 2½ shares of common for 1 share of preferred, without any adjustment in respect of dividends. Upon liquidation, holders of preferred stock were entitled to preferential distribution of the par value of their preferred stock, plus an amount equal to unpaid and accrued dividends thereon. The preferred stock was nonvoting unless dividends were in arrears in the aggregate amount of 7½% or more of the par value of the preferred, in which event holders of the preferred stock voting separately as a class were entitled solely to elect two directors. Neither class of stock had preemptive rights.

32. The minutes of a special meeting of Dearborn's board of directors, held September 13, 1946, noted among other things as follows:

Mr. Robineau stated that pursuant to the direction and authority given by the Directors at the last meeting, arrangements had been made whereby American Securities Corporation and The Dearborn Company had acquired control of Munising Wood Products Company, a Michigan corporation
* * *.

* * * * * *

Mr. Robineau reported that Munising Wood Products Company, Inc., had borrowed $500,000 and had used these funds, together with the proceeds received from its shares, to purchase from Cleveland-Cliffs Iron Company all of the outstanding shares of Munising Wood Products Company, a Michigan corporation; that concurrently with the sale Cleveland Cliffs Iron Company had entered into a contract to furnish Munising Wood Products Company quantities of hardwood logs for a period of years, and that The Dearborn Company had been required by Cleveland Cliffs Iron Company to execute a guarantee of performance of this contract by Munising Wood Products Company, a Michigan corporation. However, Mr. Robineau called attention to the fact that the existence of this contract assured Dearborn an adequate supply of vitally needed maple and birch lumber.

Mr. Robineau further stated that a contract had been entered into between American Securities Corporation and The Dearborn Company obligating certain actions with respect to voting of shares or sale thereof so long as American Securities Corporation owned at least ten per cent and Dearborn at least five per cent of the stock of Munising Wood Products Company, a Delaware corporation; that the general purport of the agreement was to protect both parties to the agreement pending a public offering or sale of the shares of American Securities Corporation.

33. On December 31, 1946, Munising Michigan was merged into Munising Delaware. Robineau and Margolis were elected officers of Munising Delaware, Robineau as president and Margolis as assistant secretary. Margolis became executive vice president in 1947. Both became directors of Munising Delaware in 1947.

34. Upon the merger of Munising Delaware and Munising Michigan, the

former succeeded to the rights of the latter under the log purchase agreement.

35. At Dearborn's annual meeting of shareholders, held February 7, 1947, Robineau reported the Munising Delaware acquisition. A motion was passed by the shareholders ratifying the acquisition and the agreement entered into with Nunemaker (finding 30). The minutes of the shareholders' meeting noted in part:

> \* \* \* [Robineau stated that] since acquiring the interest in Munising Wood Products Company, Inc., the new company had increased its profits substantially and had declared and paid a dividend of 25¢ per share in December of 1946. Mr. Robineau further stated that by virtue of the interest held in this new company, Dearborn was virtually assured of a substantial supply of both dimensional parts and maple lumber for some years to come, and therefore should increase Dearborn's profits as well as receive substantial dividends on its new investment.

36. (a) A principal reason for Dearborn's acquisition of Munising Delaware stock was the concomitant log purchase agreement (finding 29) by which Munising Delaware was assured a supply of logs, at least until March 31, 1951, the expiration date of the contract. In turn, Badger was assured a supply of lumber and dimension stock through Munising Delaware. In this regard, it was noted in Amendment No. 4 to Munising Delaware's registration statement to the Securities and Exchange Commission, filed in November 1947, that, "Upon the expiration of the \* \* \* [log purchase agreement, Munising Delaware] believes that it will nevertheless be able to obtain adequate supplies from forests in the upper peninsula of Michigan and western Ontario. In the opinion of the management of the Company for at least twenty years there will be sufficient lumber available to operate both of the Company's plants at capacity."

(b) The log purchase agreement was a favorable contract to Munising Delaware. The prices established therein were generally the current market prices, though some prices were lower than the prices at which Cleveland-Cliffs had previously sold to other customers. By November 1947, the price of logs under the contract was substantially lower than the current market price for such logs. Between 1946 and 1951, the market price for logs trebled.

(c) In late 1950, Margolis sought to negotiate a new log purchase contract with Cleveland-Cliffs. Margolis tried to develop a pricing formula under a new contract; but Cleveland-Cliffs, because of trends in price inflation, was reluctant to commit itself to a particular formula or contract term. Ultimately, a 1-year contract was worked out for the year 1951. Thereafter, Munising Delaware bought logs on the open market, as well as from Cleveland-Cliffs, as available. The record does not establish the quantities of logs purchased from Cleveland-Cliffs and others after 1951, or the relative percentages of such purchases.

37. On January 16, 1947, Munising Delaware and Dearborn entered into a management contract which provided (and is paraphrased) in pertinent part as follows:

> (a) The contract referred to Munising Delaware's business of manufacturing and selling wood products; Dearborn's business of manufacturing, assembling and selling of furniture; the large and experienced staff of Dearborn in such matters; and the desire of Munising Delaware that Dearborn manage its business operations.

> (b) Munising Delaware engaged Dearborn to render supervisory and advisory services in the capacity of a managing consultant whose acts and decisions would be subject to modification or rejection by Munising Delaware's board of directors or executive committee. Among the duties of Dearborn were the following:

> \* \* \* \* \* \*

> Production: To effect the maximum utilization of raw materials available

to Munising; to cause production to be so regulated as to use all facilities to maximum advantage and bring about a balanced production * * *

* * * * * *

Miscellaneous: To act as consultant to Munising in all matters relating to all phases of its business, and to use its best efforts to promote the maximum sale of, and to sell, the products of Munising.

(c) Munising Delaware agreed to pay Dearborn $70,000 per year for its services and for all expenses of Dearborn incurred in connection therewith.

(d) All merchandise purchased from Munising Delaware by Dearborn or any associated organization of Dearborn should be on terms and at prices applicable to merchandise sold at the time to customers of Munising Delaware generally, it being the intent that all dealings between Munising Delaware and Dearborn or its associated organizations should be conducted at arm's length. Munising Delaware was to designate an individual to pass on any order placed with Munising Delaware by Dearborn or an associated organization. Any such order should be deemed accepted by Munising Delaware unless rejected by such individual within 10 days after a copy was furnished to him.

(e) The contract was to run for 5 years, commencing January 1, 1947. A procedure was prescribed, however, for a one-time adjustment during each calendar year of Dearborn's compensation upon action initiated by either party, with arbitration if necessary to resolve the issue.

38. On September 11, 1947, Munising Delaware and Dearborn entered into a supplemental agreement to the management contract, in pertinent part (and paraphrased) as follows:

(a) Effective January 1, 1948, the management fee to Dearborn was increased to $75,000 per year. In addition, Munising Delaware agreed to pay Dearborn a commission of 4% of the net sales in excess of $2,500,000 of all products manufactured and sold by Munising Delaware each year. The commission was also to be paid on the net sales of all products not manufactured by Munising Delaware, provided that such payment would not result in a loss to Munising Delaware. The provision for adjustment of compensation, as noted in finding 37(e), was eliminated.

(b) The contract term was to run for 5 years from January 1, 1948.

39. As of November 25, 1947, Munising Delaware and Dearborn entered into a further amendment to the management contract, in pertinent part (and paraphrased) as follows:

(a) Although the services to be rendered by Dearborn remained the same, they were in certain respects to be rendered subject to prior approval of Munising Delaware's board of directors. Such prior approval was required, however, only in matters involving basic policy and not to routine operations of Munising Delaware along presently established principles or in the regular course of Munising's business.

(b) The employees of Dearborn, including Joseph F. Robineau, who performed duties under the management contract, were not to receive compensation from Munising Delaware. The compensation paid to Dearborn was to be in full for all services rendered, including the services rendered by officers, directors or employees of Dearborn who were also employees or officers of Munising Delaware.

(c) If Dearborn ceased to be the record or beneficial owner of Munising Delaware stock, or if Robineau disposed of his Dearborn stock to persons other than specified related or affiliated persons, then either party was to have the right to terminate the management contract.

(d) The November 15, 1947 amendment was to become effective only if a pending "Underwriting Agreement" referred to therein was consummated. The Underwriting Agreement had to do with the sale of certain Munising

Delaware's stock to various dealers in securities.

40. At the time Dearborn first bought Munising Delaware stock in 1946, Dearborn got an option to buy an additional 25,000 shares at $3 per share within 3 years. In 1947, the American Securities Corporation group decided to make a public offering of its Munising Delaware stock. As an inducement to Dearborn to exercise its option prior to the public offering price, the option price was reduced to $2 per share. Having no funds to make the purchase, Dearborn borrowed $44,000 from Freeman Furniture Factories, Inc., an affiliated company, and exercised the option to the extent of buying 22,000 shares at $2 per share. The remaining 3,000 shares were bought by Arlen Swiger, counsel for Munising Delaware. Sometime after November 17, 1947, the 22,000 shares purchased by Dearborn were transferred to Freeman Furniture Factories, Inc.

41. In 1947, there was an underwriting for sale to the public by American Securities Corporation and others of all the issued and outstanding preferred stock of Munising Delaware and 100,000 shares of its issued and outstanding common stock. The sellers sold 100,000 of their total of 130,000 common shares. The preferred stock was sold at $10 per share. The common stock was sold at $5.62½ per share.

42. (a) Munising Delaware declared and paid the following dividends on its common stock:

| Year | Amount per share |
|---|---|
| 1946 | $0.25 |
| 1947 | .50 |
| 1948 | .50 |
| 1949 | .18¾ |
| 1950 | .25 |
| 1951 | .07½ |
| Total | 1.76¼ |

(b) Dearborn managed affiliated companies other than Munising Delaware both before and during the term of its management contract with Munising Delaware. Dearborn received the following management fees from all companies during the years and in the amounts as follows:

(i) From Freeman Furniture:

| Year received | Amount received |
|---|---|
| 1933 | $4,184.74 |
| 1934 | 1,825.62 |
| 1935 | 1,056.95 |
| 1936 | 3,271.51 |
| 1937 | 4,442.38 |
| 1938 | 686.84 |
| 1939 | 930.48 |
| 1941 | 2,252.72 |
| 1942 | 1,093.78 |
| 1943 | 1,331.92 |
| 1944 | 3,423.74 |
| 1945 | 626.55 |
| 1946 | 6,404.75 |

(ii) From Munising Delaware:

| Year received | Amount received |
|---|---|
| 1947 | $ 69,999.96 |
| 1948 | 114,854.35 |
| 1949 | 75,000.00 |
| 1950 | 91,480.63 |
| 1951 | 97,000.00 |
| 1952 | 58,619.85 |
| 1953 | 37,500.00 |
| 1954 | 37,500.00 |

(iii) From Michigan Dimension:

| Year received | Amount received |
|---|---|
| 1950 | $19,071.99 |
| 1951 | 12,078.30 |

(iv) From Northern Seating:

| Year received | Amount received |
|---|---|
| 1951 | $13,023.13 |
| 1952 | 2,060.44 |

43. After 1946, Munising Delaware and Badger (and thus Dearborn) cooperated with each other to permit the most advantageous use of lumber obtained and processed by Munising Delaware. Badger's purchases from Munising Delaware increased substantially after 1946. Sometimes, Badger's orders for supplies, particularly dimension stock, caused Munising Delaware to turn down orders from other customers, particularly in the agricultural machinery business which was a profitable one for Munising Delaware. If Badger gave Munising

Delaware an order that would result in disruption of production or would result in improper utilization of lumber, Badger would give it relief by ordering additional supplies, thus to enable the most advantageous use of the lumber. There is no evidence that after 1946 Munising Delaware ever turned down a Badger order; however, the evidence also shows that Badger's orders were to Munising Delaware's business advantage.

After 1946, Munising Delaware sold little, if any, dimension parts to furniture manufacturers in competition with Badger. It sold some parts for infant cribs to Edison Wood Products Company. Badger did not make infant cribs. Munising Delaware also sold kiln-dried lumber to Badger after 1946, as well as dimension stock which it (Munising) had a greater capacity to produce than Badger.

44. After 1946, a new sawmill was installed at Munising Delaware's Marquette plant, which sawmill increased productive capacity by 30–40%. Kiln-drying facilities were remodeled to make them more efficient. Equipment was installed to make edge-glued parts for Badger, including dresser tops and table tops. The Marquette plant also began producing some items that it had never made before, such as table and desk tops. In the late 1950's, Munising Delaware began making completed furniture, such as cricket chairs and finished tables, which required installation of conveyors and a spray booth. Munising Delaware's facilities, after 1947, permitted it to manufacture a wide variety of wood products, and to concentrate on products in current demand, as well as items not previously made.

45. Between 1946 and 1948, Dearborn increased its employees from 38 to 50. Its net sales increased from $2,158,726 in 1946, to $2,616,401 in 1947, and then dipped slightly to $2,582,429 in 1948. Its net income increased from $307,221.04 in 1946, to $362,942 in 1947, and then fell to $282,470.53 in 1948. Its salaries, wages and other compensation followed the same trend, increasing from $269,-139.07 in 1946, to $353,444.64 in 1947, and then falling back to $309,752.68 in 1948. The record is not clear whether the increase of 12 employees between 1946 and 1948 included any salesmen. The most reasonable inference from the record is that most, if not all, of the additional employees performed services with respect to Dearborn's management contract with Munising Delaware.

46. The purchases by Badger of wood items consisting of lumber, squares, cut-stock, prefabricated parts, and finished goods from all sources and from Munising Michigan and Munising Delaware during the years 1946 to 1960, and the percentages of such purchases, were as follows:

| Years | Total purchases from all sources | Purchases from Munising | |
|---|---|---|---|
| | | Amount | Percent of total purchases |
| 1946 | $440,553 | $105,915 | 24.0 |
| 1947 | 403,087 | 343,037 | 85.1 |
| 1948 | 439,153 | 411,552 | 93.7 |
| 1949 | 226,672 | 129,102 | 56.9 |
| 1950 | 369,082 | 141,134 | 38.2 |
| 1951 | 495,525 | 237,123 | 47.8 |
| 1952 | 292,972 | 72,990 | 24.9 |
| 1953 | 442,712 | 41,827 | 9.4 |
| 1954 | 441,337 | 40,561 | 9.1 |
| 1955 | 612,085 | 321,297 | 52.4 |
| 1956 | 803,570 | 327,366 | 40.7 |
| 1957 | 581,310 | 173,585 | 29.8 |
| 1958 | 429,585 | 50,424 | 11.7 |
| 1959 | 556,899 | 149,711 | 26.8 |
| 1960 | 949,085 | 45,972 | 4.8 |
| Total | 7,483,627 | 2,591,596 | 34.6 |

47. Between 1946 and 1960, Munising Delaware's net sales were as follows:

| Year | Net sales of Munising |
|---|---|
| 1946 | $2,491,896 |
| 1947 | 3,354,043 |
| 1948 | 3,466,291 |
| 1949 | 2,458,090 |
| 1950 | 3,280,758 |
| 1951 | 3,847,936 |
| 1952 | 2,509,707 |
| 1953 | 2,419,390 |
| 1954 | 1,901,697 |
| 1955 | 1,718,231 |
| 1956 | 1,434,628 |
| 1957 | 1,338,118 |
| 1958 | 1,404,650 |
| 1959 | 1,100,630 |
| 1960 | 503,639 |
| Total | 33,229,704 |

48. Between January 1, 1947 and September 30, 1947, Munising Delaware sold about 92% of its total dimension-stock production to Dearborn and its affiliates, accounting for about $220,000 in sales. During the same period, Munising Delaware's net sales of all its products were $2,541,525.77.

49. (a) Munising Delaware also produced items for companies affiliated with Dearborn other than Badger. It made wooden parts for ultimate use by the Northern Seating Company to make school desks. Though the record is not clear, it appears that Dearborn owned a minor interest in the Northern Seating Company. The amount of sales to Northern Seating Company and the years of such sales are not established in the record.

(b) The Freeman Company ("Freeman") was a wholly-owned subsidiary of Dearborn. It was incorporated in 1947. Its function was to market finished furniture to retail dealers and chainstores in the United States. Its items were the lower-priced items on which Dearborn did not wish to put its trade name. It bought its furniture from Badger, Munising Delaware and others. The purchases made by Freeman from all sources and from Munising Delaware during the years 1947 to 1960 were as follows:

| Years | Total purchases (before returns) from all sources | Total purchases (before returns) from Munising | |
|---|---|---|---|
| | | Amount | Percent of total purchases |
| 1947 ...... | $ 23,382 | $15,694.61 | 67.5 |
| 1948 ...... | 171,380 | 6,470.33 | 3.8 |
| 1949 ...... | 314,082 | 3,083.06 | 0.98 |
| 1950 ...... | 178,769 | 707.57 | 0.4 |
| 1951 ...... | 24,312 | 21,619.06 | 89.0 |
| 1952 ...... | 171,390 | 24,365.07 | 14.2 |
| 1953 ...... | 124,702 | 15,355.05 | 12.3 |
| 1954 ...... | 193,953 | 4,380.62 | 2.3 |
| 1955 ...... | 191,146 | 1,574.27 | 0.8 |
| 1956 ...... | 85,778 | 2,117.83 | 2.4 |
| 1957 ...... | 247,678 | 94,821.01 | 38.3 |
| 1958 ...... | 188,675 | 133,803.26 | 70.8 |
| 1959 ...... | 621,380 | 291,668.67 | 46.8 |
| 1960 ...... | 350,131 | 12,874.56 | 3.7 |
| Total .... | 2,886,758 | 628,534.96 | 21.8 |

50. (a) In the early 1950's, a subsidiary corporation, Munising Wood Products Canada, Ltd., was formed by Munising Delaware to buy timberlands in Canada. Canadian timberlands were purchased with a view to providing Munising Delaware with a standby timber supply when the prices of Cleveland-Cliff's timber increased. It was anticipated that the Canadian timberlands would supply about 300,000 board feet of lumber per year, which was less than 2% of Munising Delaware's requirements in the early 1950's. Ultimately, it turned out that the cost of getting logs out of Canada and transporting them to Marquette was higher than anticipated. Thus, the logs were sold to local sawmills and Munising Delaware bought lumber from those mills and transported it to Marquette. The record does not show how much lumber was so bought or when.

(b) In 1951, Munising Delaware acquired a wholly-owned subsidiary, Michigan Dimension Company ("Michigan Dimension"), located at Manistique, Michigan. Michigan Dimension operated a sawmill, dry kiln, made rough dimension stock, and had some turning capacity. It was acquired as a hedge against a possible strike threatening the Marquette plant at that time. Munising Delaware had contract commitments to its customers, including Badger, and it was feared a strike would interfere. Michigan Dimension sold dimension stock to Badger and others, though the record does not establish in what quantities. Most items sold to customers other than Badger were for furniture pieces which Badger did not manufacture and thus were items which Badger could not use.

The Michigan Dimension plant was closed by Munising Delaware in or about 1952, after the strike threat at Marquette ended. At that time, Michigan Dimension was losing money.

51. In the early 1950's, the operations at the Munising, Michigan plant of Munising Delaware became uneconomical, due to increasing competition from

foreign-made products and increases in labor and log costs. To improve efficiency and effect economies through consolidation of operations, the plant at Munising, Michigan, was closed down in mid-1955 and its operations moved to the Marquette plant. Insofar as the needs of Badger (and Dearborn) were concerned, closing the plant at Munising, Michigan, was of no great moment since that plant supplied little, if any, of the lumber and dimension stock needed to make furniture. It made primarily household woodenware which Dearborn itself did not sell.

52. On January 12, 1956, a fire at the Marquette plant destroyed the finishing shop and finishing equipment. Temporarily, the plant at Munising, Michigan, was reopened and operated, partly with personnel from Marquette. With insurance proceeds, the Marquette plant was rebuilt. The evidence is not clear whether the fire hampered or otherwise affected Munising Delaware's ability to produce lumber and dimension stock. The reasonable inference is that it had little effect because the finishing shop and equipment were used principally to make finished products, rather than lumber and dimension stock.

53. From August 31, 1957 to sometime in October 1957, Munising Delaware's Marquette plant was closed down due to losses and declining sales. In October 1957, the Marquette plant was reopened and began to produce completed furniture items, such as dining room tables, chairs and buffets, cricket chairs, and occasional tables. This new product line was created partly because the tariff structure continued to favor foreign imports of houseware items of the kind manufactured in the past by Munising Delaware and partly to supply Dearborn with its furniture requirements. Badger was unable to supply all of Dearborn's requirements for finished furniture; and furthermore, it was desired by Munising Delaware's management to produce finished furniture products to help absorb overhead, including materials and labor costs.

With respect to the tariff structure, Munising Delaware's management decided to concentrate on furniture items and accessories which were not exposed to foreign competition. Some furniture was made for sale under Munising Delaware's trademark "Robinhood." With respect to supplying Dearborn's needs, about 90% of the cricket chairs made by Munising Delaware went to fill contracts of Dearborn with the Woolworth Company; and all the dining room furniture went to the Montgomery Ward Company to fill Dearborn contracts. With respect to other finished furniture made by Munising Delaware, the record does not establish what proportion went to Dearborn (or affiliates) and what proportion was sold to others, either for resale under the "Robinhood" trademark or for resale otherwise.

54. Munising Delaware's Marquette plant was permanently closed on April 29, 1960. Munising Delaware could not negotiate a satisfactory labor contract, in large measure because the local labor market, which included iron and steel plants, precluded wage scales which permitted economic operation in the face of competition with foreign imports and wood products manufactured elsewhere in the United States. For the year ended December 31, 1959, Munising Delaware had a net loss of $163,230, making a total deficit as of December 31, 1959, of $296,816. No dividends had been paid to preferred shareholders since March 31, 1958, with total dividend arrearages on December 31, 1959, aggregating $27,117.

55. After the Marquette plant was closed in 1960, steps were taken to sell both the Marquette and Munising plants and their equipment. No sales were made, however, in 1960. Munising Delaware's deficit as of December 31, 1960, was $501,440. In 1961, the Marquette plant's machinery and equipment were sold at public auction and the real estate at Munising, Michigan, was sold. Munising Delaware had a net loss for the year ended December 31, 1961, of $98,280, bringing the total deficit as of the end

of the year to $599,720. In 1962, part of the real estate at Marquette, Michigan, was sold. Munising Delaware had net income in 1962 of $805.49, which was the difference between its gain on the real estate sale and its expenses for the year. Its end-of-the-year deficit was thus reduced to $598,914.75. In February 1963, Munising Delaware went into the coin-operated dry cleaning and laundry business, in which it was engaged through 1969, the time of trial. It sustained a loss from operations in 1963 of $27,410.-48, and a net loss for the year of $33,137, for a deficit as of December 31, 1963, of $632,051.75. The remaining real estate at Marquette remained unsold.

56. (a) On December 29, 1960, Dearborn sold 82,802 shares of Munising Delaware common stock to Carl Holzheimer for $4,140.10. The aggregate cost of that stock to Dearborn was $155,393.38. The dates of the purchases, the number of shares purchased, the cost to Dearborn of those purchases, and the sellers, were as follows:

| Date of purchase | Number of shares purchased | Total purchase price | Seller |
|---|---|---|---|
| Aug. 31, 1946 ... | 75,000 | $150,000.00 | Munising Michigan. |
| Nov. 6, 1957 .... | 235 | 205.63 | Frank Cook-Cook Investment Co. |
| Dec. 11, 1957 ... | 100 | 75.00 | Mrs. Patricia K. Sherer. |
| Dec. 11, 1957 ... | 400 | 300.00 | W. H. Sherer. |
| Jan. 27, 1958 ... | 3,817 | 2,862.75 | Joseph M. Strauch. |
| Dec. 9, 1958 .... | 650 | 325.00 | A. L. Margolis. |
| Dec. 23, 1958 ... | 2,400 | 1,500.00 | Cook Investment Co. |
| Dec. 26, 1958 ... | 200 | 125.00 | Cook Investment Co. |
| Total ...... | 82,802 | 155,393.38 | |

Two of the above-noted purchases were from employees of Munising Delaware (Strauch and Sherer) who were leaving the employ of Munising Delaware. Mrs. Patricia K. Sherer was W. H. Sherer's wife.

(b) In 1963, Carl Holzheimer sold 82,-802 shares of Munising Delaware common stock at a price of $4,140.10. Title to the stock was taken in the name of Mrs. Sylvia Robineau.

57. Robineau and Margolis retained their respective positions as president and executive vice president of Munising Delaware through December 31, 1966. They also remained as directors, along with MacMerrill Birnbaum and Newton B. Schott, at least through 1963. The other member of the board of directors in 1960, Arthur S. Grossman, died sometime in 1962.

58. During the 1960's, Badger was unable to fill all of Dearborn's requirements for furniture, particularly with respect to a large contract with Montgomery Ward. Badger had difficulties getting sufficient dimension stock and at times could only provide about half of Dearborn's needs. Nevertheless, Badger's purchases of wood items increased from $556,899 in 1959 to $949,085 in 1960, reflecting an increase in Dearborn's business. Although the record is not entirely clear, it appears that part of the large increase in Badger's expenditures between 1959 and 1960 resulted from higher prices it had to pay for dimension stock. Dearborn lost some retail customers because of its inability to fill orders.

Despite its difficulties getting sufficient furniture from Badger, so far as the record shows, Dearborn made no attempts after 1960 to acquire another dimension plant. Nor did Badger build additional kiln-drying facilities, largely because of space limitations.

59. On its 1960 Federal income tax return, Dearborn claimed a loss on the sale of Munising Delaware stock as a capital loss. Margolis testified that, after consultation with tax counsel, prior to

filing the 1960 return, he (Margolis) instructed Dearborn's tax accountants to claim the loss on the 1960 return as an ordinary loss. Mr. Trojan, secretary of Dearborn, signed the return. Trojan did not discuss the matter with Margolis. Margolis learned 2 years later that the loss had been claimed as a capital loss.

## ULTIMATE FINDINGS AND CONCLUSIONS

■ 60. Section 1221 of the 1954 Internal Revenue Code defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business), but does not include" (1) stock in trade or property of a kind includable in inventory; (2) property held primarily for sale to customers in the ordinary course of business; (3) real and depreciable personal property used in a trade or business; (4) copyrights, literary, musical or artistic compositions, or similar property held by the creator or any person whose basis is derived from the creator; (5) accounts and notes receivable acquired for services or stock in trade; and (6) certain Government obligations. Corporate stock (other than that held by securities dealers) is not included in the above-enumerated exceptions; and as a general rule, corporate stock is considered and held by the courts to be a capital asset. *See, e. g.,* Exposition Souvenir Corp. v. Commissioner of Internal Revenue, 163 F.2d 283 (2d Cir. 1947); Logan & Kanawha Coal Co., 5 T.C. 1298 (1945).

■ 61. If, however, corporate stock is purchased in the ordinary course of business, as an integral and necessary act in the conduct of the business, and is purchased without investment intent, then such stock is not a capital asset under § 1221; and any loss on its sale is treated as a loss against ordinary income rather than as a capital loss. Smith & Welton, Inc. v. United States, 164 F. Supp. 605 (E.D.Va.1958); Booth Newspapers, Inc. v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962); FS Services, Inc. v. United States, 413 F.2d 548, 188 Ct.Cl. 874 (1969); Waterman, Largen &

Co. v. United States, 419 F.2d 845, 189 Ct.Cl. 364 (1969). *Cf.* Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

62. Dearborn acquired a stock interest in Munising Delaware in 1946 (75,-000 shares) for the following reasons (listed in descending order of importance to Dearborn):

(a) to secure control of production facilities for making kiln-dried lumber and dimension stock for Badger so to ·

(i) maintain Dearborn's present business of selling furniture (findings 13(b), 17, 19, 20, 21, 24, 32, 43, 44, and 53), and

(ii) increase Dearborn's business of selling furniture in future years (findings 19, 24, 25(a), 26(b), 35, 43, 44, and 53),

(b) to receive dividend income from Munising Delaware stock (findings 24, 25(a), 26(b), 35, 37, and 42(a)),

(c) to receive fees for the management of Munising Delaware (findings 24, 26(b), 37, 38, 39, 42(b), and 45), and

(d) to share in potential capital growth of Munising Delaware's business of producing a wide variety of wood products (findings 22, 24, 25(a), 26(b), 32, 41, and 44).

While (a), above, was the principal reason for the stock acquisition, (b), (c) and (d) were substantial reasons and constitute investment intent and purpose.

63. The stock acquisition was intended to be permanent, and not a temporary expedient for the short term. There is no evidence to suggest that at the time the stock was acquired, Dearborn had any intention of disposing of it at some future time when its needs for wood supplies became available elsewhere. *Cf.* Western Wine & Liquor Co., 18 T.C. 1090 (1952); Electrical Fittings Corp., 33 T.C. 1026 (1960). Rather, the evidence shows that Dearborn intended to hold the stock indefinitely as means to maintain and increase its furniture business and to operate and manage Munising Dela-

ware as a profit-making business in its own right. *Cf.* Duffey v. Lethert, 63–1 U.S.T. Cas. ¶ 9442 (D.Minn.1963); Smith & Welton, Inc., *supra.*

64. Though Badger had difficulties prior to 1946 getting sufficient wood raw materials to meet at all times Dearborn's sales needs, there is no evidence that Dearborn made attempts at any time prior to 1946 to enter into long (or short) term supply contracts, exclusive or otherwise, and at reasonable prices or otherwise, with anyone (including Munising Michigan and Cleveland-Cliffs) to assure to itself and Badger a source of lumber and dimension stock to meet present and future needs. *Cf.* Booth Newspapers, Inc., *supra;* FS Services, Inc., *supra.* Nor is there evidence that the acquisition of Munising Delaware stock was essential to preventing a loss of needed raw materials. *Cf.* Missisquoi Corp., 37 T.C. 791 (1962); Smith & Welton, Inc., *supra.* Timberlands in the upper peninsula of Michigan, from which Munising Delaware (and Badger) got most of their lumber, were extensive. From the above, it is reasonable to infer (a) that Badger's supply problems, though aggravated at the end of World War II, were something less than critical; and (b) that Dearborn's acquisition of Munising Michigan stock was not the culmination of fruitless efforts to acquire (or prevent the loss of) a source of supply, short of acquiring a stock interest in, and management control of, Munising Michigan as a supplier.

65. (a) Dearborn's purchase of Munising Michigan stock in 1946 was not required by the American Securities Corporation group as a condition to such group's purchase of Munising Michigan. The most that can be inferred from the evidence is that the American Securities Corporation group, recognizing Badger's requirements for a steady supply of wood raw materials and Dearborn's expertise in matters of making and marketing furniture products, wanted Dearborn to manage the new corporation (Munising Delaware) and considered it important and desirable for Dearborn to own an interest in it. *Cf.* Waterman, Largen & Co., *supra.*

(b) Dearborn did not pay a premium price for Munising Delaware stock in 1946. Rather, it paid $2 per share at a time when it was anticipated that a later public offering would yield substantially more per share. In fact, the American Securities Corporation group sold 100,-000 shares in 1947 by public offering at $5.62½ per share. *Cf.* Booth Newspapers, Inc., *supra;* FS Services, Inc., *supra.*

66. (a) From 1946 to 1951, Munising Delaware paid a total of $1.76¼ per share in dividends on its common stock. During that period, Dearborn owned 75,-000 shares; it therefore received about $132,000 in dividends, a return of about 88% on its $150,000 investment. *Cf.* Smith & Welton, Inc., *supra;* Missisquoi Corp., *supra;* Gulftex Drug Co., 29 T.C. 118 (1957), aff'd per curiam, 261 F.2d 238 (5th Cir. 1958).

(b) From 1947 to 1954, Dearborn received $581,954.75 in management fees from Munising Delaware.

(c) From 1946 to 1960, Badger and Freeman purchased wood products (lumber, dimension stock and finished furniture) from Munising Delaware in the amount of $3,220,130.96. This constituted about 31.1% of the total purchases of wood products by such companies. The balance of 68.9% was purchased from sources other than Munising Delaware.

(d) From 1946 to 1960, Munising Michigan's net sales of wood products (household and industrial products, dimension stock, etc.) to all its customers were $33,229,704, of which $3,220,130.-96 (9.7%) constituted sales of lumber, dimension stock and finished furniture to Dearborn, Badger and Freeman.

67. Dearborn's purpose and intent in acquiring an additional 7,802 shares of Munising Delaware stock in 1957 and 1958 is not clear from the record. Apparently, most of the shares were acquired as an accommodation to Dearborn employees who were leaving Dearborn's employ. There is no evidence that such acquisitions were tied to any business needs of Dearborn, such as management control of Munising Delaware. Thus, the evidence establishes no clear business

need for such acquisitions; and it must therefore be inferred that the acquisitions were with substantial investment intent. *Cf.* Booth Newspapers, Inc., *supra.*

68. (a) Dearborn's purchase of Munising Delaware stock in 1946 was motivated by a substantial investment purpose and intent. Accordingly, the stock was held as a capital asset by Dearborn; and the loss on its ultimate sale is a capital loss.

(b) Dearborn's purchase of Munising Delaware stock in 1957 and 1958 was motivated by a substantial investment purpose and intent. Accordingly, the stock was held as a capital asset by Dearborn; and the loss on its ultimate sale is a capital loss.

### CONCLUSION OF LAW

Upon the foregoing opinion, findings of fact, and ultimate findings and conclusions which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover. Accordingly, the petitions are dismissed.