## ARKANSAS BEST CORPORATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18954–80.    Filed October 29, 1984.

---

*Vester T. Hughes, Jr., David F.P. O'Connor, Eric R. Cromartie,* and *Stephen D. Good,* for the petitioner.

*Raymond L. Collins* and *Rebecca W. Wolfe,* for the respondent.

Nims, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1969 | $20,224 | 1973 | $244,352 |
| 1970 | 20,224 | 1974 | 230,519 |
| 1971 | 50,560 | 1975 | 928,911 |
| 1972 | 3,355,968 | 1976 | 2,077,163 |

After concessions, the issues presented for decision are (1) whether petitioner's loss on the sale of its controlling interest in a bank is ordinary or capital loss, (2) whether the bank stock was acquired in a transaction qualifying as a tax-free reorganization under section 368(a)(1)(C),[1] and (3) whether petitioner is entitled to a bad debt deduction for the partial chargeoff of a note acquired in connection with the sale of the bank stock.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner had its principal office in Fort Smith, AR, at the time the petition in this case was filed.

Arkansas Best Freight System, Inc. (ABF), is a successful trucking line operating in the midwestern United States.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, except as noted.

During its early existence, ABF grew primarily by acquiring established trucking companies. In the early 1960's, ABF's banker, First National City Bank (now Citibank), suggested that a holding company be formed to facilitate acquisitions and avoid various restrictions which accompanied the truckline's regulation by the Interstate Commerce Commission (ICC).

In March 1966, Arkansas Best Corp. (hereinafter Arkansas Best or petitioner), was formed as a holding company. The management and control of Arkansas Best resided with Robert A. Young, Jr. (Young), and members of his family. Arkansas Best immediately embarked on a program of expansion with a plan of ultimately becoming a diversified conglomerate.

The envisioned conglomerate was to be composed of businesses from three sectors of the economy: transportation, consumer goods, and financial services. Transportation was already represented by ABF, the trucking line. In rapid succession, Arkansas Best then acquired Riverside Furniture Corp. (Riverside), a company engaged in furniture manufacturing, distribution, and sales, and Data-Tronics, a company which offered data processing services.

Riverside was to be the core of the consumer goods sector of the conglomerate. Data-Tronics was acquired for a slightly different reason. Arkansas Best desired the aid of a computer in the trucking business but could not afford the cost of the necessary computer. The acquisition of Data-Tronics permitted Arkansas Best to have use of a computer while marketing its services to third parties to reduce costs. Data-Tronics devoted approximately one-half of its services to the needs of Arkansas Best and its subsidiaries.

Arkansas Best then established Arkansas Bandag Corp. (Bandag), a company engaged in new tire sales and tire retreading. Bandag also held title to the real estate of Arkansas Best and the other subsidiaries. Initially, ABF (the trucking subsidiary) represented up to one-half of Bandag's tire business but that percentage had declined to approximately 5 percent by the time of trial.

In the financial services area, Arkansas Best acquired Universal Insurance Co. (UIC) and Arkansas Underwriters Corp. (AUC). The companies were useful for the truckline which was "a high utilizer of insurance."

These five subsidiaries—ABF, Riverside, Data-Tronics, Bandag, UIC, and AUC—were wholly owned by Arkansas Best. Arkansas Best provided financial planning and, in some cases, accounting and personnel services to its subsidiaries. In return, the companies paid a management fee to Arkansas Best.

From the date of Arkansas Best's incorporation in 1966 until his death in August 1973, Robert A. Young served as chairman of the board of Arkansas Best. During the period from March 1967, to April 1968, Young personally acquired the following stock and security interests in National Bank of Commerce (NBC), a bank located in Dallas, TX:

| Interest | Book value |
|---|---|
| Capital convertible debentures of NBC | $742,600 |
| Contract to purchase 24,534 shares of convertible preferred stock of NBC | 1,145,700 |
| 209,013 shares of common stock of NBC | 5,798,196 |
| Total | 7,686,496 |

On June 6, 1968, Young transferred these interests to Young, Inc., a personal holding company incorporated by Young 3 weeks earlier. These interests, plus $1,000 cash, constituted the assets of Young, Inc.

Three weeks later, on June 29, 1968, Young, Inc., transferred to Arkansas Best all of its stock and securities in NBC. In return, Young, Inc., received 150,000 shares of series C convertible preferred stock of Arkansas Best[2] plus the assumption by Arkansas Best of Young, Inc.'s liabilities which totaled $7,686,995. The Internal Revenue Service accepted the transaction as a tax-free reorganization.

As a result of the foregoing transaction, Arkansas Best owned 266,614 shares of NBC common stock at the end of 1968.[3] These shares represented 64.97 percent of the outstanding common stock of NBC at that time.

In connection with its acquisition of the bank's stock, Arkansas Best obtained three appraisals of NBC's stock from unrelated investment banking firms. It also obtained five 8-

---

[2] The stipulated fair market value of the 150,000 shares at the time of the transfer was $1,500,000.

[3] Earlier in 1968, Arkansas Best had separately acquired 3,363 other shares of NBC at a cost of $86,128.

year forecasts from Citibank projecting the expected growth and earnings of the bank.

At the time Arkansas Best acquired the bank stock, Arkansas Best was aware that there were bills pending in Congress which, if enacted, might impact upon its holding of NBC stock. In a notice to shareholders calling a special meeting for June 29, 1968, concerning the proposed acquisition of NBC stock, a proxy statement was included which informed shareholders of the following:

Bills affecting banking are pending in Congress. The Company is unable to predict whether any such bills will be passed or the effect on the Company's or NBC's business if one or more such bills were passed. However, one such bill, if passed, would amend the Bank Holding Company Act of 1956 to provide that the Company, by virtue of its ownership of NBC shares, would be a bank holding company. With certain exceptions, such Act requires bank holding companies to divest themselves of direct or indirect ownership of voting shares of companies which are not either banks or bank holding companies. A bank holding company is also prohibited, with limited exceptions, from acquiring direct or indirect ownership or control of more than 5% of the voting shares of any company which is not a bank or from engaging directly or indirectly in business unrelated to the business of banking or controlling banks.

Arkansas Best had a number of reasons for acquiring the stock of NBC. First, the city of Dallas was developing rapidly as a financial center and banks were at the center of the boom. NBC appeared likely to share in this growth, and the value of its stock was therefore likely to appreciate.

Second, Arkansas Best planned to make a public offering of its stock. Under generally accepted accounting principles, Arkansas Best could not include NBC, a bank, in the consolidated financial statements of Arkansas Best and its nonbanking subsidiaries. Under the so-called equity method of accounting, however, Arkansas Best was permitted to reflect a pro rata portion (i.e., approximately 65 percent) of NBC's earnings in its financial statements contained in the offering materials. This practice of one-line equity consolidation of earnings was available at the time to any corporate shareholder which owned 20 percent or more of another corporation.

An additional benefit received by ABC was an increase in its aggregate price/earnings ratio. Because banks enjoy relatively high price/earnings ratios compared to certain of Arkansas Best's subsidiaries, Arkansas Best's acquisition of NBC in-

creased its aggregate price/earnings ratio. The higher price/earnings ratio consequently enabled Arkansas Best to obtain a higher price for its shares in the public offering.

Other subsidiary benefits to Arkansas Best from the acquisition of NBC's stock were prestige and acceptance in the Dallas financial community because of association with the bank, added protection from hostile takeover attempts because the bank was subject to Federal regulation, and, finally, improved access to financing because the bank stock represented attractive collateral.

NBC did not, however, interact with Arkansas Best and its subsidiaries in the same way the subsidiaries and Arkansas Best interacted with each other. NBC offered no financing to Arkansas Best or its subsidiaries. Moreover, NBC contributed very little to the conglomerate by way of earnings distributions. Banks typically pay low dividends because they are subject to strict capital retention requirements.

Arkansas Best supplied no management services to NBC and consequently received no management fees from NBC. At any one time, Arkansas Best had no more than three representatives on NBC's board of directors which on the average consisted of 20 members. In any event, NBC's board of directors had very limited influence over management decisions at the bank because its review was restricted to actions already taken.

On December 31, 1970, Congress enacted the 1970 Amendments to the Bank Holding Company Act. Under the statute and the regulations promulgated thereunder, Arkansas Best was deemed to be "in control" of NBC for purposes of the Bank Holding Company Act, and therefore to be a "bank holding company" as defined in that act.

Status as a bank holding company required Arkansas Best to either (1) cease making acquisitions of new lines of nonbanking businesses or of going-concern acquisitions in its existing lines of nonbanking businesses, or (2) divest itself of its entire interest in the bank.

Arkansas Best chose the second alternative and, on July 30, 1971, it filed an irrevocable declaration of divestiture with the Federal Reserve Bank of Dallas. The notice of divestiture declared that Arkansas Best would divest itself of control of

NBC by January 1, 1981. Once the notice was filed, Arkansas Best was free to make acquisitions of nonbanking businesses.

Arkansas Best carried the bank stock on its financial records as an "investment." As noted previously, generally accepted accounting principles prevented Arkansas Best from including NBC as part of its consolidated group.

In corporate documents, Arkansas Best made repeated references to NBC as an investment. For example, attached to the minutes of the quarterly and annual meeting of the board of directors of Arkansas Best, held May 17, 1972, was a "Statement of Corporate Objectives" which included the following goals (emphasis added):

*ABC Corporate Structure Viz Diversification*

1. Three major components to corporate earnings each subject to separate economic forces and business risks.

2. No single factor to contribute more than 50 percent of revenues as a long run corporate strategy.

3. Direct management control of subsidiaries (*e.g., National Bank of Commerce now treated as an investment of the holding company from an operational standpoint*).

4. Exploit additional growth potential in trucking, furniture, Bandag and Data-Tronics both internally and by acquisition.

During the period from 1969 through 1974, Arkansas Best participated in a number of capital calls made by NBC in response to concerns of Federal regulators that NBC was not adequately capitalized. Also during this period, Arkansas Best acquired additional shares of NBC through stock dividends, purchase, and conversion of debentures. These transactions are summarized as follows:

| Year | Number of shares acquired | Cost | Transaction |
|---|---|---|---|
| 1969 | 142,670 | $3,639,266 | Two capital calls |
|  | 24,188 | 723,928 | Purchase |
| 1970 | - - - | - - - | - - - |
| 1971 | 43,347 | - - - | Stock dividend |
| 1972 | 19,072 | - - - | Stock dividend |
|  | 95,363 | 2,407,915 | Capital call |
|  | 6,165 | 616,500 | Purchase |

| Year | Number of shares acquired | Cost | Transaction |
|------|---------------------------|------|-------------|
| 1973 | 23,902 | - - - | Stock dividend |
| | 103,887 | $2,077,740 | Capital call |
| | 135 | 13,500 | Purchase |
| | 8% Conversion of debentures | 3,116,610 | Capital call |
| 1974 | 124,664 | - - - | Conversion of debentures |
| | 2,402 | 61,946 | Purchase |
| Total | 585,795 | 12,657,405 | |

At the end of 1974, Arkansas Best owned 852,409 shares of the common stock of NBC which represented 65.77 percent of the stock then outstanding.

From 1968 until 1972, the bank appeared to be successful and growing. The capital calls during this period were made to accommodate this growth.

In 1972, Arkansas Best commenced negotiations with Texas Commerce Bancshares to divest itself of the NBC stock in a stock exchange on terms favorable to Arkansas Best. Representatives of Texas Commerce Bancshares examined the loan portfolio of NBC and discovered serious problems. Texas Commerce Bancshares withdrew from the negotiations.

Federal examiners then undertook their own investigation of NBC's financial position. Weak loans in a bank's portfolio are denoted as such by four classifications assigned by the examiners. In order of increasing gravity, the classifications are (1) loans especially mentioned, (2) substandard loans, (3) doubtful loans, and (4) loss loans. When a bank has more than 50 percent of its loan portfolio classified as weak loans, the bank is considered a problem bank.

NBC was considered to be a problem bank from 1973 through approximately 1977. The difficulties stemmed primarily from a heavy concentration of loans in the local Dallas real estate industry which suffered a severe collapse at about that time.

In July 1974, Arkansas Best still held out hope of disposing of the NBC stock at a profit and apparently expected capital gain treatment on such a transaction. The minutes of the board of directors meeting for that month summarized the following report by the company's general counsel, Mr. Harper:

[The chairman of the board] stated that he had discussed the desirability of disposing of the company's 60% interest in National Bank of Commerce of Dallas with individual directors and they wished to retain the services of Goldman, Sachs and Company, investment bankers, to assist and advise in efforts to divest NBC.

Mr. Harper reviewed the tax treatment of a one-bank holding company in forced divestiture, stating legislation had been proposed in Congress that banks in such circumstances would not receive rollover tax treatment with no capital gains, but hopefully there would be granted a ten-year period in which to spread the capital gain, or until 1985, whichever comes first. He said we hoped for a method where if the bank would be divested and the money or assets received be invested in a new asset, the capital gain would be delayed until the new asset was disposed of. * * *

The capital calls issued by NBC after 1972 were in response to the loan portfolio problems of the bank. Arkansas Best participated in these capital calls for a number of reasons. First, participation of the controlling shareholder was essential to save the bank and thus Arkansas Best was compelled to participate if it wished to preserve its equity in the bank. Second, failure to participate with the resultant demise of the bank exposed Arkansas Best to litigation by the minority shareholders. Third, permitting the bank to fail would reflect badly on Arkansas Best so that its sources of financing might be jeopardized and its reputation for skilled management might be tarnished.

On June 30, 1975, Arkansas Best finally sold the bulk of its holdings in NBC stock. It sold to a group of 63 Texas investors (the Brooks group), a block of 661,000 shares of stock which constituted 51 percent of the outstanding common stock of NBC.

In exchange, Arkansas Best received (1) $1,059,914 in cash and (2) a note with a face amount of $6,006,176, secured by the 661,000 shares of stock (the note). The fair market value of the note on June 30, 1975, was $4,878,088.

By December 1975, it appeared likely that NBC would require even greater infusions of capital than contemplated at the sale. The Brooks group approached Arkansas Best, which still owned 14.7 percent of NBC's outstanding stock, to solicit financial assistance. Arkansas Best refused to make any more efforts to rescue the bank but consented to subscribe to 14.7 percent of the next capital call.

At its directors meeting of December 20, 1975, however, Arkansas Best did accept in principle a compromise suggestion advanced by the Brooks group. The Brooks group suggested that the note should be sold to some third party who could more certainly assist with NBC's capital needs.

On January 21, 1976, Arkansas Best made a book entry writing down the value of the note by $4,485,876. The note was not in default at this time, but the directors of Arkansas Best had received some indications that the Brooks group might have some difficulties in honoring its obligation. The accounting entry was made to reflect the underlying book value of the NBC stock securing the note.

One member of the Brooks group ultimately located a buyer for the note held by Arkansas Best. On February 9, 1976, Arkansas Best executed a memorandum of agreement with the prospective buyer, Coke L. Gage (Gage). On April 7, 1976, Arkansas Best sold the note to Gage for $1,652,500. As a condition of this sale, Arkansas Best acquired an additional 573,953 shares of NBC's common stock in a capital call for $1,233,999.[4]

At approximately the same time as the sale of the note to Gage, Arkansas Best granted William R. Riley (Riley) an option to purchase its remaining 765,362 shares of NBC stock in annual installments through 1980. Riley or his assignees exercised these options rights as follows:

| Year | Number of shares purchased | Price |
|------|------|------|
| 1976 | 15,000 | $33,000 |
| 1977 | 50,000 | 110,000 |
| 1978 | 215,226 | 473,497 |
| 1979 | 215,226 | 473,497 |
| 1980 | 269,910 | 593,802 |
| Total | 765,362 | 1,683,796 |

At the close of these transactions, Arkansas Best owned no shares of NBC stock nor any other stock or security interest in NBC.

---

[4]In connection with the sale, Arkansas Best incurred sales expenses of $33,050 and legal fees of $5,050.

OPINION

This case raises the question whether the loss realized on the sale of stock by a conglomerate may be characterized as ordinary loss under the Supreme Court's decision in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955).

Petitioner is a holding company whose only assets are the stock and securities of other corporations. The holding company is the nucleus of a diversified conglomerate with subsidiaries engaged in the businesses of transportation, consumer goods, and financial services.

In 1968, petitioner acquired a controlling interest (approximately 65 percent of the outstanding common stock) in a bank located in Dallas, TX, the National Bank of Commerce (NBC). In 1970, Congress enacted certain amendments to the Bank Holding Company Act of 1956, the net result of which was to classify petitioner as a bank holding company by virtue of its ownership interest in NBC.

Status as a bank holding company put petitioner to the following choice: (1) Cease making acquisitions of nonbanking businesses, or (2) divest itself of the NBC stock. Petitioner chose the second alternative and, in 1971, filed an irrevocable declaration of divestiture with the Federal Reserve Bank of Dallas which guaranteed divestiture by 1981.

Petitioner sold 51 percent of NBC's outstanding stock in one block in 1975. It disposed of the remaining 14.7 percent in installments over the following 5 years pursuant to an option granted in 1975. On its Federal income tax return for 1975, petitioner claimed an ordinary loss of $9,995,688 from the disposition of NBC stock.

Section 1221 defines the term "capital asset" to mean any property held by the taxpayer with certain enumerated exceptions. In *Corn Products*, the Supreme Court observed that "The preferential treatment provided by [section 1221] applies to transactions in property which are not the normal source of business income." *Corn Products Refining Co. v. Commissioner*, 350 U.S. at 52. The Court further observed that "Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly."

In *Corn Products*, the Court was confronted with transactions which appeared to be ordinary and not capital despite the fact that the property involved did not properly come within any of the exclusions set out in section 1221. The taxpayer in that case was a company engaged in converting corn into starch, syrup, and other products. To assure its supply of corn and protect itself against increases in the price of corn, the taxpayer regularly purchased and sold corn futures. The Supreme Court held that losses sustained on these transactions warranted ordinary loss treatment because Congress intended "that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." *Corn Products Refining Co. v. Commissioner, supra* at 52.

This judicially created addition to the exclusions set out in section 1221 was subsequently expanded by the lower courts to include, under certain circumstances, irregular or unique transactions such as dispositions of stock. The principles governing the application of the *Corn Products* doctrine to the sale of securities were summarized by the Court of Claims in a leading case as follows:

> if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.
>
> Thus, the circumstances of the transaction (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) are of crucial importance in the resolution of these cases. The fact that securities are "property," in the broad sense of that term, is not conclusive. [*Booth Newspapers, Inc. v. United States*, 157 Ct. Cl. 886, 303 F.2d 916, 921 (1962).]

In this case, we must first resolve a threshold issue in order to apply the principles set out above: What is the trade or business of petitioner holding company, if, indeed, a holding company can have a trade or business as that term is used in the Internal Revenue Code?

The term "trade or business" is not defined in the Internal Revenue Code nor in the regulations nor by an authoritative

judicial definition in the case law. In 1941, the Supreme Court held that the management of securities by an individual for his own account, even through an elaborate operation requiring an office and staff, was not a trade or business for purposes of section 162. *Higgins v. Commissioner*, 312 U.S. 212 (1941). See *Whipple v. Commissioner*, 373 U.S. 193, 202–203 (1963); *Bodzy v. Commissioner*, 321 F.2d 331 (5th Cir. 1963); *United States v. Byck*, 325 F.2d 551 (5th Cir. 1963); *Deely v. Commissioner*, 73 T.C. 1081 (1980); *Moller v. United States*, 721 F.2d 810 (Fed. Cir. 1983).

The *Higgins* decision prompted the enactment of the predecessor to section 212. Congress sought to permit taxpayers to deduct ordinary and necessary expenses incurred for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. By its terms, section 212 applies only "In the case of an individual." The failure of Congress to include corporations in the coverage of that section gives rise to a negative implication that all corporations necessarily have a trade or business and, accordingly, do not require the aid of section 212 in order to deduct expenses incurred for the production of income.[5]

Petitioner contends that it is in the trade or business of acquiring and managing going concerns in diverse yet complementary lines of business. Although at first impression it may appear that the acquisition and management of stock holdings in other businesses constitutes activity peculiarly like that of an investor, there is judicial support for characterizing such activity as a trade or business. In a case which squarely addressed this question, the Court of Claims considered what, if any, was the business of Allied Chemical, a holding company:

The parties have agreed that the acquisition of the stock in American was a part of Allied's business, which at that time was confined to the holding of stocks in other companies. What does the business of a holding company consist of? Briefly stated, it consists of conserving and protecting its holdings, influencing, or directing when it can, the management of the

---

[5] See B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 20.1.2 (1981): "As for corporations, the fact that Congress did not include them in IRC section 212 suggests the possibility that the term 'trade or business' as used by IRC section 162 was thought to be broad enough to embrace a corporation's activities in managing its own investments."

companies in which it holds stock, so as to increase the value of its holdings and the income to be derived therefrom, the collection of dividends, the advantageous disposition of stocks in companies with whose management it is not satisfied; or where it appears desirable to do so, and reinvesting the proceeds, etc. [*Allied Chemical Corp. v. United States*, 158 Ct. Cl. 267, 305 F.2d 433, 437 (1962).]

In another analogous case, this Court found a closed-end investment company to be in a trade or business:

[Stock] was a part of petitioner's stock in trade as a closed-end investment company. To protect this investment was well within the scope of its business, which consisted of investment in, and management of, securities of other corporations. * * * [*Alleghany Corp. v. Commissioner*, 28 T.C. 298, 303 (1957).]

We accept that petitioner, as a holding company, was in a trade or business defined as the acquisition and management of going concerns in diverse yet complementary lines of business. Our inquiry then, as framed by *Booth Newspapers*, is whether petitioner purchased and held the stock of NBC as an integral and necessary act in the conduct of that business or whether the stock was purchased or held with an investment purpose.

When a taxpayer harbors mixed motives of investment and business purpose, as is often the case, the rule is now settled that "stock purchased with a substantial investment purpose is a capital asset even if there is a more substantial business motive for the purchase." *W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 712 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977). Compare *Dearborn Co. v. United States*, 195 Ct. Cl. 219, 444 F.2d 1145 (1971), and *Agway, Inc. v. United States*, 207 Ct. Cl. 682, 524 F.2d 1194 (1975), with *Union Pacific Railroad Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343 (1975).[6]

When a taxpayer's motive changes between the time of purchase and the time of disposition, whether from investment purpose to business purpose or from business purpose to investment purpose, the character of the gain or loss at disposition of the stock will be capital. This rule "illustrates the fact that corporate stock is normally a capital asset, and

---

[6]As noted in *W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 710 (1976), the Court of Claims' decision in *Union Pacific Railroad Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343 (1975), may be viewed as casting doubt on the vitality of *Dearborn Co. v. United States*, 195 Ct. Cl. 219, 444 F.2d 1145 (1971), and *Agway, Inc. v. United States*, 207 Ct. Cl. 682, 524 F.2d 1194 (1975).

that only where both original purpose of acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." *W.W. Windle Co. v. Commissioner*, 65 T.C. at 714 n. 15.

In short, the business purpose must persist, without a substantial investment purpose, throughout the purchase and holding period if the gain or loss is to be characterized as ordinary under the *Corn Products* doctrine.

In this case, the acquisition of NBC stock by petitioner may be viewed in two stages: (1) The initial acquisition of a 65-percent interest in 1968, plus the acquisition of additional shares by purchase, capital calls, and stock dividends during the "growth" phase (1969–72) of the holding period, and (2) the acquisition of additional shares by purchase, capital calls, and stock dividends during the "problem" phase (1973–76) of the holding period. Arkansas Best's reasons for acquiring and holding the stock in each instance were different.

We find that the acquisitions of NBC stock over the period from 1968 to 1972 were motivated primarily by investment purpose and only incidentally by some business purpose.

Arkansas Best was aware of the rapid development of Dallas, TX, as a financial center during the early 1960's and was eager to take advantage of the boom. Banks were at the center of the expansion, and NBC appeared likely to share in the benefits. Arkansas Best viewed NBC as an attractive investment.

Arkansas Best obtained several appraisals of NBC and forecasts of the bank's earnings. The prospects were very appealing. Had these projections been realized, Arkansas Best's investment in NBC would have experienced strong appreciation. This Court in *W.W. Windle* found projections such as these to bear on investment purpose:

These projections make it impossible for us to find that there was no substantial investment motive. Had the projections been realized, Nor-West would have been a good investment. * * * [65 T.C. at 705.]

See *Datamation Services, Inc. v. Commissioner*, T.C. Memo. 1976–252.

The business purposes asserted by petitioner were at most secondary to the investment purpose, e.g., enhancing Arkansas Best's stock price in a planned public offering, prestige in

the Dallas financial community, and added protection against hostile takeover attempts.

Moreover, Arkansas Best held the stock in such a way as to belie any business purpose at all. NBC was the only subsidiary not wholly owned by Arkansas Best and was never integrated into the "complementary group" of businesses governed by Arkansas Best. The bank was not permitted to supply financing to Arkansas Best or its subsidiaries, and Arkansas Best did not supply management services to or receive a management fee from the bank. The bank contributed very little to the conglomerate by way of earnings distributions. Finally, Arkansas Best exercised very limited influence over the bank's management and, at any one time, never had more than three representatives on NBC's 20-man board of directors.

In contrast, the other subsidiaries often acted as suppliers and customers for one another, paid management fees to Arkansas Best, contributed substantial capital to the conglomerate's use, operated under extensive control from Arkansas Best, and otherwise existed as integral and complementary units of the conglomerate. See *Booth Newspapers, Inc. v. United States, supra; Union Pacific Railroad Co. v. United States, supra.*

The divestiture notice in 1971 finally eliminated any remaining prospect of bringing NBC into the complementary system of companies comprising the conglomerate. The directors of Arkansas Best had been aware of this possibility even when the NBC stock was initially acquired in 1968.

The fact that NBC's special status as a bank in part foreclosed its integration into the conglomerate does not alter the hard reality of its separate and distinct character as an investment holding. The bank was not an integral and necessary part of Arkansas Best's business. The actual relationship, not the hoped for or potential relationship, determines whether an asset is part of the everyday operations of the business.

Accordingly, under the principles articulated in *W. W. Windle*, we hold that the character of the loss realized on the disposition of the NBC shares of common stock acquired in the years 1968 through 1972 is capital loss.[7]

---

[7] We note in passing that during the time when Arkansas Best still hoped to realize a gain on the sale of NBC pursuant to the divestiture declaration, the directors of Arkansas Best apparently expected the gain to be capital gain. See findings of fact, *supra.*

We turn then to the shares of NBC stock acquired by Arkansas Best in the years 1973 through 1976. The reasons for these purchases differed significantly from the reasons for the earlier purchases. We find that these later purchases were made exclusively for business purposes and subsequently held for the same reasons.

After 1972, the bank's poor financial health became alarmingly apparent to Arkansas Best. Because of these difficulties, NBC experienced a need for substantial capital infusions. The probable consequence of Arkansas Best not participating in the capital calls during this period would have been the demise of the bank.

Owning a controlling interest in a bank—a highly regulated, peculiarly public institution—imposed a special responsibility on Arkansas Best. After 1972, Arkansas Best acquired additional shares of NBC stock to meet this obligation and protect its own business reputation.

As a growing conglomerate, Arkansas Best depended upon its good reputation with creditors in order to assure a reliable source of financing for acquisitions. In addition, Arkansas Best's reputation as a conglomerate especially skilled in management determined its standing with other businessmen and in the stock market. (Arkansas Best was listed on the American Stock Exchange beginning in 1969 and on the New York Stock Exchange beginning in 1972.) Association with the failure of a bank would have severely blemished Arkansas Best's reputation in the financial and business communities in which it operated.

Moreover, the demise of the bank would have exposed Arkansas Best (as the controlling shareholder) to potentially damaging and costly litigation by minority shareholders.

Expenditures to preserve business reputation are typically currently deductible business expenses. *Dunn & McCarthy, Inc. v. Commissioner*, 139 F.2d 242 (2d Cir. 1943). The purchase of stock may be a necessary tactic in the protection of business reputation, and, in certain narrow circumstances, may invoke the doctrine of *Corn Products.*

Arkansas Best was not compelled to make purchases of NBC stock after 1972 nor could it have been motivated by the prospect of obtaining a profitable return on its purchases. The conglomerate carried through on a losing proposition solely to

preserve its business reputation and therefore we hold that it is entitled to an ordinary loss on the disposition of NBC shares acquired in the years 1973 through 1976.

It must be observed that a small percentage of shares was acquired during this period by purchase. One purchase was motivated by business purposes and is also entitled to ordinary loss treatment. The purchase was made from the outgoing president of NBC in order to secure his resignation as chief executive officer of NBC and to secure his promise that he would cease disrupting negotiations for the sale of NBC.

The second purchase was from Universal Insurance Co. Petitioner asserts that this purchase was made to protect its subsidiary from regulatory sanctions because "as NBC had ceased paying dividends in 1974, NBC stock no longer constituted an admitted asset in determining the adequacy of Universal's capital and surplus for insurance regulatory purposes." The parties had stipulated, however, that this purchase was made from Universal Insurance Co., "a corporation *subsequently* acquired by ABC [Arkansas Best] as a consolidated subsidiary" (emphasis added). Protection of a subsidiary cannot have been the purpose of this purchase if the insurance company was not a subsidiary at the time of the purchase. Accordingly, these NBC shares must be treated as capital assets along with the initially acquired shares.

Finally, the conversion of the debentures by Arkansas Best in 1974 did not reflect optimistic investment purpose, as respondent contends, but rather an effort to further ease pressures on the bank by removing the burden of making fixed interest payments. The loss on the shares so acquired is entitled to ordinary loss treatment.

In order for the loss to be properly apportioned between its capital and ordinary components as determined above, we must address the second issue raised by petitioner. The loss should be apportioned according to the respective amounts of basis for each of the two sets of stock acquisitions. The amount realized on the disposition of all the shares of NBC stock is undisputed. The basis for the shares acquired in 1973 and subsequent years is likewise undisputed.

The parties disagree, however, whether the basis of the shares initially acquired in 1968 should include the value of 150,000 shares of Arkansas Best preferred stock (stipulated to

be $1,500,000) tendered by Arkansas Best in the 1968 transaction. This basis dispute must be resolved in order to determine what portion of the total amount realized should be allocated to the respective capital and ordinary bases. Petitioner argues that the 1968 transaction was a purchase and that the value of the 150,000 shares of Arkansas Best's preferred stock was part of Arkansas Best's cost. Respondent argues that petitioner should be equitably estopped from characterizing the 1968 transaction as anything other than a tax-free reorganization, as petitioner had represented the transaction in 1968. In the alternative, respondent argues that the 1968 transaction was indeed a tax-free reorganization under section 368(a)(1)(C).

Arkansas Best concedes that it intended the 1968 transaction with Young, Inc., to be a tax-free reorganization, and that it represented the transaction as such on its Federal income tax return and to respondent. For the purposes of this case, however, Arkansas Best now urges that the transaction should not have been treated as a tax-free reorganization because the assumption of liabilities in the transaction was excessive and the requisite continuity-of-interest was thereby not preserved. Petitioner cites the following passage from section 1.368–2(d), Income Tax Regs.:

(1) * * * In determining whether the exchange meets the requirement of "solely for voting stock", the assumption by the acquiring corporation of liabilities of the transferor corporation, or the fact that property acquired from the transferor corporation is subject to a liability, shall be disregarded. *Though such an assumption does not prevent an exchange from being solely for voting stock for the purposes of the definition of a reorganization contained in section 368(a)(1)(C), it may in some cases, however, so alter the character of the transaction as to place the transaction outside the purposes and assumptions of the reorganization provisions. Section 368(a)(1)(C) does not prevent consideration of the effect of an assumption of liabilities on the general character of the transaction* but merely provides that the requirement that the exchange be solely for voting stock is satisfied if the only additional consideration is an assumption of liabilities. [Emphasis added.]

We find it unnecessary to address the merits of this issue raised by petitioner because we hold that petitioner is equitably estopped from asserting that the 1968 transaction with Young, Inc., was other than a tax-free reorganization.

Section 1.1016–6(b), Income Tax Regs., provides that "In determining basis, * * * the principles of estoppel apply, as elsewhere under the Code, and prior internal revenue laws."

The doctrine of equitable estoppel is, however, to be sparingly applied in Tax Court litigation and only in special circumstances. Cf. sec. 1311 et seq.

The traditional elements of estoppel required at common law are as follows:

(1) Conduct amounting to a misrepresentation or concealment of a material fact; (2) actual or imputed knowledge of the misrepresentation by the party to be estopped; (3) absence of knowledge of facts by the party in whose favor estoppel is applied; (4) intention or expectation of the party to be estopped that the representation or concealment will be acted upon by the other party; (5) reliance by the party seeking the estoppel; and (6) detriment to the party seeking the estoppel resulting from his reliance. See 10 J. Mertens, Law of Federal Income Taxation, sec. 60.02 (1976). [*Sangers Home for Chronic Patients, Inc. v. Commissioner*, 72 T.C. 105, 115 (1979).]

We find it unnecessary, however, to consider whether each of the above elements of estoppel are present in the instant case because, based on the related doctrine of "duty of consistency," we hold petitioner is barred from asserting that the 1968 transaction with Young, Inc., was not a tax-free reorganization.

The duty of consistency, which is sometimes referred to as quasi-estoppel, is based on the theory that the taxpayer owes the Commissioner the duty to be consistent with his tax treatment of items and will not be permitted to benefit from his own prior error or omission. *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497 838–839 (1980). Although the duty of consistency is akin to estoppel and has the same effect, its application does not require the presence of all the technical elements of estoppel. *Wichita Coca Cola Bottling Co. v. United States*, 152 F.2d 6 (5th Cir. 1945); *Southern Pacific Transportation Co. v. Commissioner, supra*.

In *Bartel v. Commissioner*, 54 T.C. 25 (1970), we were asked to decide whether the duty of consistency applied to the following situation. Taxpayer in *Bartel* was the sole shareholder of a corporation which was liquidated in 1964. During the preceding 11 years, taxpayer had received disbursements from the corporation which were treated by him as loans for income tax purposes. In holding that the duty of consistency prevented taxpayer from asserting that the corporation disbursements were not loans but rather compensation or dividends (and thus requiring taxpayer to compute the portion of the gain on the

liquidation attributable to the loans as cancellation of indebtedness), we found particularly relevant the Fifth Circuit Court of Appeals' statement regarding the duty of consistency in *Orange Securities Corp. v. Commissioner*, 131 F.2d 662, 663 (5th Cir. 1942), affg. 45 B.T.A. 24 (1941):

While it is true that income taxes are intended to be settled and paid annually each year standing to · itself, and that omissions, mistakes and frauds are generally to be rectified as of the year they occurred, this and other courts have recognized that a taxpayer may not, after taking a position in one year to his advantage and after correction for that year is barred, shift to a contrary position touching the same fact or transaction. When such a fact or transaction is projected in its tax consequences into another year there is a duty of consistency on both the taxpayer and the Commissioner with regard to it, whether or not there be present all the technical elements of an estoppel. * * * [*Bartel v. Commissioner, supra* at 29.]

In the instant case, we believe the duty of consistency is equally applicable. Petitioner intended and represented that its acquisition of approximately 65 percent of the stock of NBC in 1968 to be a tax-free reorganization under section 368(a)(1)(C). Now, over 15 years later and well beyond the passing of the statute of limitations for that taxable year, petitioner asks us to find that the transaction was not a tax-free reorganization but in fact a purchase. As we stated in *Bartel*, "not only the equities but the practical administration of the law argue against * * * petitioner's request." 54 T.C. at 32. See also *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. 82, 86 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972). Accordingly, we hold the duty of consistency requires Arkansas Best to treat its initial acquisition of NBC as a tax-free reorganization.[8]

The third and final issue in this case is whether petitioner is entitled to a bad debt deduction for the partial chargeoff of the note acquired in the sale of the bulk of the NBC stock. On June 30, 1975, Arkansas Best sold 51 percent of NBC's outstanding

---

[8]Estoppel and its various counterparts, such as quasi-estoppel, are affirmative defenses which must be pleaded and proved. *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 838 (1980); Rule 39. Although respondent failed to formally plead estoppel, his intention to raise the issue was set forth in his trial memorandum filed with the Court and made a part of the record prior to trial. Petitioner was thus given adequate notice that respondent intended to argue the estoppel issue and consequently suffered no detriment due to respondent's failure to formally plead estoppel. Furthermore, petitioner does not argue on opening or reply brief that respondent is barred from asserting the estoppel issue on the ground that it was not formally pleaded.

stock to a group of 63 Texas investors, herein referred to as the "Brooks group." In exchange, Arkansas Best received cash and a note with a face amount of $6,006,176 secured by the 51 percent interest in NBC (the note). On January 21, 1976, Arkansas Best wrote down the value of the note by $4,485,876 and later took a partially worthless bad debt deduction for the 1975 taxable year, which respondent disallowed.

The deductibility of partially worthless debts is governed by section 166(a)(2), which provides as follows: "When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." The language of the statute is permissive rather than mandatory, and whether a debt is partially deductible is a decision committed to the sound discretion of the Commissioner. *Brimberry v. Commissioner*, 588 F.2d 975, 977 (5th Cir. 1979), affg. a Memorandum Opinion of this Court.

A debt may be charged off as partially worthless within a taxable year only if the taxpayer shows with reasonable certainty that a specific, ascertainable portion of the debt was no longer collectible. *Sika Chemical Corp. v. Commissioner*, 64 T.C. 856, 863 (1975). In evaluating a taxpayer's claim of partial worthlessness, the Commissioner must consider all the circumstances, including the value of the collateral securing the debt and the financial condition of the debtor. *Brimberry v. Commissioner, supra* at 977; sec. 1.166–2(a), Income Tax Regs. The same regulation also provides that the Commissioner's determination will not be disturbed unless it is plainly arbitrary or unreasonable, indicating an abuse of discretion.

Petitioner offers two points in support of the partial worthlessness of the note in 1975: (1) Arkansas Best had received indications that the Brooks group anticipated difficulties in meeting the capital demands of NBC, and (2) the value of the NBC stock securing the note had declined in value over the 6 months since the acquisition of the note.

We find nothing unreasonable or arbitrary in respondent's disallowance of the claimed deduction for partial worthlessness of the note. The facts relied upon by petitioner are insufficient to amount to a "reasonable certainty" that a portion of the note was no longer collectible given the circumstances existing in 1975. In late January 1976, petition-

er, as directed by its independent auditors, adjusted the carrying value of the $6 million note and petitioner's remaining investment in the stock of NBC to a level that would reflect the underlying book value of NBC as determined by audit. Petitioner made the chargeoff due to pressure from its independent auditors who were concerned not about tax accounting but rather the integrity of petitioner's financial statements.

We do not deem it appropriate to equate the amount of the chargeoff for partial worthlessness of the note to the difference between the face amount of the note and the book value of the NBC stock securing the note as collateral. Book value, which under the circumstances, was perhaps the most expedient method of valuing the stock for financial statement purposes, is by no means to be deemed the equivalent of actual fair market value for tax purposes. Furthermore, since with all its difficulties NBC was by no means insolvent as of the date of the writedown of the note for financial reporting purposes, so that the value of the NBC stock would have continued to fluctuate up and down from day to day, the fair market value of the stock on the day of the financial report writedown may well have been the next day's irrelevancy. Consequently, petitioner has not convinced us that it has shown with reasonable certainty that a specific, ascertainable portion of the debt was no longer collectible at the time of the chargeoff. See *Thompson v. Commissioner*, T.C. Memo. 1983–81, and cases cited therein.

Respondent argues in the alternative that since petitioner was negotiating the sale of the note at the time its value was written down, any loss realized was from the sale of a capital asset rather than from a partial bad debt. Since we have held that no deduction is allowable for partial worthlessness, we need not address respondent's alternative argument.

*Decision will be entered under Rule 155.*