ANGUS ADAIR MYERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ARDEN E. MYERS and EDITH M. MYERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Myers v. Commissioner
Docket Nos. 34863-84, 34874-84.
United States Tax Court
T.C. Memo 1986-518; 1986 Tax Ct. Memo LEXIS 93; 52 T.C.M. (CCH) 841; T.C.M. (RIA) 86518; October 20, 1986. James L. Schwartz,Mark H. Schiff,Paul T. Saharack, and Steven M. Heinz, for the petitioners. Robert L. Archambault, for the respondent. COHEN
MEMORANDUM *94 FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income tax: Petitioner
Docket No.
Year
Deficiency
Arden E. and
34874-83
1980
$63,985
Edith M. Myers
1981
13,711
Angus Adair Myers
34863-84
1980
65,890
1981
2,541
The issues for decision are whether the statute of limitations bars assessment of petitioners' 1980 taxes, and whether certain commodity futures transactions resulted in capital or ordinary loss. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners resided in McCook, Nebraska, at the time their petitions were filed. Petitioners Arden E. Myers and Edith M. Myers, husband and wife, filed joint Federal income tax returns for the taxable years 1980 and 1981 with the Internal Revenue Service Center in Ogden, Utah. Petitioner Angus Adair Myers filed individual income tax returns for the same years. In 1980 and 1981, Arden E. Myers and Angus Adair Myers were entitled to equal distributive shares of the income, *95 gain, loss, deductions, and credits of Myers Brothers, a partnership. Each of the issues in dispute involves adjustments to the 1980 and 1981 partnership returns of Myers Brothers. Myers Brothers (the partnership) owned a 7,000 acre ranch in McCook, Nebraska. During 1980 and 1981, the partnership raised cattle, corn, and wheat; they began to cultivate soybeans in 1982. The partnership did not purchase cattle as part of its ongoing business; it raised its own cattle. From 375 to 500 cows were on the ranch at any given time. Each year, these cows calved in the spring and continued to graze into the summer. In the fall, the calves were placed in a feedlot where they remained for approximately a year until they were ready to go to market, i.e., finished fat cattle. During 1980 and 1981, from 800 to 1,000 head of cattle were on petitioners' ranch at any given time. The pounds of cattle on feed during those years usually ranged from approximately 600,000 pounds to 1 million pounds. In 1980 the partnership sold approximately 425 head of cattle, including 375 head of finished fat cattle and 50 cows. Of the finished 375 fat cattle, approximately 50 percent were steers; the remaining *96 50 percent were heifers averaging 1,100 pounds each. In 1981 the partnerships sold 237 head of cattle, including 87 steers and 150 heifers. In each of the years in issue, the partnership harvested approximately 150,000 bushels of corn and approximately 40,000 bushels of wheat, all of which were placed with the Commodity Credit Corporation (CCC) as security for nonrecourse loans under the CCC agricultural loan program. By loaning the partnership the fair market value of these commodities, the CCC guaranteed a floor price for the partnership's corn and grain. In 1980 and 1981, the partnership stored some of the corn in silos for its own use as feed for the cattle; the rest of the corn was sold. The partnership did not plant soybeans in 1980 or 1981, but began to raise them in 1982. In 1982, petitioners irrigated 150 acres for the cultivation of soybeans, and harvested approximately 50 to 60 bushels per acre. Soybeans were a supplement used in the cattle feed on the partnership's ranch. In 1980 and 1981, the partnership purchased and sold futures contracts for corn, wheat, soybeans, cattle, hogs, gold, treasury bill and treasury bonds. The partnership was at times "long" in *97 the market and other times "short" in the market, and, at times, spread (long one future month and short another in the same commodity). The partnership realized gains and losses in certain commodity futures transactions during 1980 and 1981, as follows: 1980
Commodity
Gain or (Loss)
Live Cattle
($237,567.50)
Feeder cattle
62,421.50 Soybeans
( 116,238.50)
Soybean meal
3,220.00 Soybean oil
4,560.00 Corn
( 35,962.50)
Wheat
8,132.50 Net Loss
($311,434.50)
1981
Commodity
Gain or (Loss)
Live cattle
$26,892.50 Feeder cattle
( 32,838.00)
Soybeans
4,842.50 Corn
( 7,572.50)
Wheat
( 13,055.00)
Net Loss
($21,730.50)
On Schedules F of its 1980 and 1981 returns (Forms 1065), the partnership claimed deductions for commodity futures hedging losses totaling $330,435 for 1980 and $57,701 for 1981. Respondent, in his notices of deficiency, disallowed these ordinary loss deductions but allowed the losses as short term capital losses. On November 4, 1983, petitioners and respondent executed Form 872-A, Special Consent to Extend the Time to Assess Tax, in which they timely agreed to extend the period for assessment *98 of each petitioner's 1980 income tax liability. That form provided that the extended period of limitations would terminate 90 days after: (1) the Internal Revenue Service (IRS) received Forms 872-T, Notice of Termination of Special Consent to Extent the Time to Assess Tax, from petitioners; or (2) the IRS executed and mailed Forms 872-T to petitioners; or (3) the IRS mailed notices of deficiency to petitioners. The Forms did not provide for any other methods of terminating the extension. On February 7 and 17, 1984, counsel for petitioners mailed letters to respondent purporting to terminate petitioners' consent and requesting that respondent issue a notice of deficiency. These letters were received by respondent on or before February 10 and 21, 1984, respectively. Neither of the petitioners sent to respondent a Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax. On July 11, 1984, more than 140 days after it received the letters from petitioners' counsel, respondent mailed a notice of deficiency to petitioners. ULTIMATE FINDING OF FACT The partnership's 1980 and 1981 commodity futures transactions were not an integral part of its business. *99 OPINION Petitioners argue that the applicable statute of limitations barred assessment of their 1980 tax liabilities. Petitioners also contend that certain commodity futures transactions were "hedges" integrally related to the partnership's business, and that, as a result, losses incurred in these transactions were deductible as ordinary losses. The Statute of Limitations
Petitioners argue that the applicable period of limitations expired before respondent issued the notices of deficiency for 1980. On November 4, 1983, respondent and each of the petitioners agreed to extend the period of limitations for the assessment of petitioners' 1980 income tax liabilities. The parties executed Forms 872-A, Special Consent to Extend the Time to Assess Tax. Neither respondent nor petitioners executed Forms 872-T. Respondent mailed notices of deficiency more than 90 days after receipt of letters from petitioners' counsel that purportedly terminated the extension. Petitioners argue that respondent's determination is therefore barred by the statute of limitations. This Court rejected a similar argument in Grunwald v. Commissioner,86 T.C. 85 (1986). [1] In that *100 case we held that a letter from an IRS appeals officer to the taxpayers' counsel was not sufficient to terminate a Form 872-A, and that the parties were bound by the explicit termination provisions of the form. 86 T.C. at 89. Because Form 872-A provided that the Commissioner could terminate the agreement only by issuing a statutory notice of deficiency or by executing and mailing a Form 872-T, the appeals officer's letter did not terminate the consent agreement. Cases decided before the introduction of Form 872-T, such as Johnson v. Commissioner,68 T.C. 637 (1977), and Borg-Warner Corp. v. Commissioner,660 F.2d 324 (7th Cir. 1981), revg. a Memorandum Opinion of this Court, were found to be no longer controlling. 86 T.C. at 90. Petitioners' reliance on Rault v. Commissioner,T.C. Memo. 1982-283, is therefore misplaced because, like Johnson and Borg-Warner,Rault was decided before respondent revised Form 872-A and adopted Form 872-T. The letters from petitioners' counsel are not Forms 872-T and thus did not terminate petitioners' consent to extend the period for assessment of tax. The statutory *101 notices were therefore timely as to both years in issue. Commodity Futures
Petitioners contend that losses incurred on disposition of certain commodity futures *102 contracts were deductible as ordinary losses. [2] In 1980 and 1981 the partnership purchased and sold futures contracts for hogs, gold, treasury bills, and treasury bonds. Petitioners do not claim that these transactions were entered into for hedging purposes. The partnership also purchased and sold futures contracts for corn, wheat, soybeans, soybean meal, soybean oil, live cattle, and feeder cattle. Relying on Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955), petitioners contend that the purchase and sale of these contracts was an integral part of the partnership's farming business, and that losses incurred in the disposition of these futures contracts were therefore deductible as ordinary losses.
Respondent maintains that petitioners have failed to prove that the partnership's trades were an integral part of its farming business. Respondent also *103 contends that the partnership's records of its futures transactions establish speculation, negating the characterization of the transactions as hedges. Subsections (a) and (c) of section 165 provide that individuals may deduct losses incurred in a trade or business or any transaction entered into for a profit. Subsection (f) of section 165 limits the extent to which losses on the sale or exchange of capital assets may be deducted. Section 1221 defines "capital asset" as "property held by the taxpayer," but excludes several specific types of property from that definition. Because commodity futures contracts are not specifically excluded, they are generally treated as capital assets. Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955); Day v. United States,734 F.2d 375, 376 (8th Cir. 1984); Modesto Dry Yard Inc. v. Commissioner,14 T.C. 374, 384-385 (1950). Section 1233(a) specifically provides that gain or loss from short sales of commodity futures shall be treated as gain or loss from the sale of a capital asset. Section 1233(g), however, states that section 1233(a) "shall not apply in the case of a hedging transaction *104 in commodity futures." Petitioners maintain that they fall within the Corn Products exception to the general treatment of commodity futures as capital assets. In Corn Products Refining Co. v. Commissioner,supra, the Supreme Court held that corn futures purchased and sold by the taxpayer were not capital assets, even though the futures were not within the literal terms of the exclusions set forth by the predecessor of section 1221. The taxpayer purchased the futures to protect its manufacturing operations from increases in the price of raw materials. The Supreme Court held that the sales were an integral part of the taxpayer's business and that, as a result, the taxpayer's gains were taxable as ordinary income. 350 U.S. at 50. Subsequent cases have applied Corn Products to allow ordinary losses in futures transactions intended to "hedge" or guard against adverse fluctuations in the prices of commodities used or produced in a taxpayer's business. Wool Distributing Corp. v. Commissioner,34 T.C. 323 (1960); Kurtin v. Commissioner,26 T.C. 958 (1956). The Court of Appeals for the Eighth Circuit, to which *105 this case is appealable, has expressly declined to extend Corn Products beyond its facts. Arkansas Best Corp. v. Commissioner,800 F.2d 215 (8th Cir. 1986), affd. in part and revg. in part 83 T.C. 640 (1984). Whether the partnership's transactions were hedges integrally related to its farming business is a question of fact, and petitioners have the burden of proof. Corn Products Refining Co. v. Commissioner,350 U.S. at 51; Day v. United States,734 F.2d at 376; Wool Distributing Corp. v. Commissioner,34 T.C. at 339; Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have not met their burden. A futures position is not a "hedge" simply because it involves a commodity produced or consumed by the taxpayer's business. A futures position is a "hedge," and produces ordinary gain or loss, only if it was intended to serve as such. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. 1056, 1068 (1957), revd. on other issues 251 F.2d 764 (7th Cir. 1958). Evidence of market trends, of anticipated deficiencies of supply or production, and of actual *106 positions in the commodities in question, have in other cases justified a conclusion that certain futures positions were acquired as hedges. Kurtin v. Commissioner,26 T.C. at 958; Wool Distributing Corp. v. Commissioner,34 T.C. at 323. Petitioners did not present such persuasive evidence here. The testimony of Angus Adair Myers was general and conclusionary. For example, although he explained why the partnership might want to "go long," i.e., contract to accept delivery in the future, on cattle to hedge its actual position, he did not describe how any combination of market conditions or anticipated production problems had led the partnership to purchase or sell any specific cattle futures. He did not describe why the partnership had, in general or on any specific occasion, purchased or sold futures contracts for any other commodity. He did not establish the existence of risk by providing evidence of the partnership's relative long and short positions in futures and actual contracts on any specific date. He testified in general terms about the partnership's actual positions in each commodity, but not about the positions that, on a given *107 date, led the partnership to acquire a specific number of futures contracts as a hedge. He asserted that he relied on his brokerage house to tell him when to hedge, and he could not explain why specific contracts were closed when they were. We also give little weight to the testimony of William M. Phelan (Phelan), petitioners' "expert" witness. Although Phelan was a vice president of the Chicago Mercantile Exchange from 1967 to 1975, he was a practicing lawyer during the years in issue and at the time of trial. He testified about the general nature of commodity futures hedges and opined that every transaction in issue "could be justified in some fashion a hedge with respect to the Myers Brothers' operation." Phelan did not, however, explain his reasons for this conclusion or testify about any specific transaction. His knowledge of the partnership's business was limited, and his study of its futures transactions was cursory. His testimony was conclusionary and unpersuasive. We need not, therefore, accept it. See Helvering v. Nat. Grocery Co.304 U.S. 282 (1938). The remainder of petitioners' evidence on this issue consists of: (1) a receipt for a single sale *108 of cattle, (2) several ledger sheets detailing farm receipts, and (3) many additional ledger sheets listing the partnership's 1980 and 1981 futures positions. Petitioners' exhibits show that many transactions took place, but they do not show the purpose or intent behind any of these transactions. These exhibits are often illegible and never self-explanatory. Petitioners have not analyzed any of the lengthy columns of figures on these documents, many of which contain arithmetic inaccuracies, and have not explained how any of the figures in their exhibits show that the partnership's futures positions were hedges. They cannot meet their burden of proof by offering, without analysis or comment, this undigested record of the partnership's transactions. [3]
*109 Respondent, on the other hand, has carefully analyzed the partnership's many transactions to show that the partnership's records of its futures positions are replete with evidence of speculation.[4] The partnership was "in and out" of the futures market throughout the year; in 1980, for example, 55 of the partnership's 89 live cattle positions were open for no longer than 10 days. See Day v. United States,734 F.2d at 376-377. [5] Although the partnership produced no more than 75,000 to 100,000 bushels of corn each year, in November 1980 it was long for 425,000 bushels of July 1981 corn. There was little correlation between the sale or delivery months of petitioners' futures contracts and business events such as the birth of calves; although most calves were born in the spring, the partnership was long on feeder cattle in the late summer or early fall. The partnership actually increased its exposure to risk by going long on corn when it was about to be harvested; if the market price of corn fell, the partnership would lose on its futures as well as on its crop. The partnership often held "spread" positions, that is, simultaneous long and short positions in the *110 same commodity in different months; from December 9, 1980, to December 22, 1980, for example, 50 long January 1980 soybean contracts were fully spread with 60 short May 1981 contracts. The normal purpose of a "spread" is to profit from changes in relative market price, not to hedge. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. at 1067-1068. Finally, the partnership had little, if any, reason to hedge several of the commodities it produced. The CCC program fully protected corn and wheat from declines in market price. The partnership did not produce a crop of soybeans until 1982, and never sold feeder cattle, yet often went short in each of these commodities. *111 Petitioners have not proven that the partnership's futures transactions were an integral part of its business. Moreover, petitioners do not seriously question respondent's analysis of petitioners' transactions, and that analysis persuades us that petitioners' transactions were for speculation rather than hedges. The losses claimed must therefore be treated as capital losses. To reflect the foregoing, Decision be will be entered for the respondent.
Footnotes
1. See Jordan v. Commissioner, 1986-124. In Tapper v. Commissioner,766 F.2d 401 (9th Cir. 1985), affg. per curiam an order of this Court, the Ninth Circuit affirmed the Tax Court's unpublished denial of a Motion for Summary Judgment for the reason that the taxpayer had no standing to challenge a decision to which he had consented. In dicta referring to the Form 872-T, the court stated that: The [T]ax[C]ourt correctly concluded that Form 872-A unambigously requires the taxpayer to use Form 872-T to terminate the extension and that Norman Tapper's letter was not sufficient to terminate the extension because it was not directed to the proper division and that division was never apprised of taxpayers' desire to terminate the extension. [766 F.2d at 404.] We do not believe that the dicta in Tapper is contrary to this Court's opinion in Grunwald v. Commissioner,86 T.C. 85 (1986). See Roberson v. Commissioner,T.C. Memo. 1986-520↩.
2. A "long" futures position is a contract to accept delivery in the future; a "short" position is a contract to deliver in the future. For a general discussion of the mechanics and terminology of trading in commodity futures see Smith v. Commissioner,78 T.C. 350, 354-355↩ (1982).
3. The proper trial of a case before the * * * [Tax Court] requires thorough preparation, a clear understanding of the issues, and the marshaling of the evidence in such a way as to indicate clearly the effect of the same and the issue to which it appertains. This is not accomplished by dumping into the hands of the * * * [Tax Court] a number of books of account and other similar evidence. Such evidence is not self-illuminating.The * * * [Tax Court] should not be asked to ferret out the correct answer to technical or difficult questions of law and fact from unexplained, uncoordinated evidence. * * * [Meade v. Commissioner,T.C. Memo. 1973-46, 32 T.C.M. 200, 208, 42 P-H Memo par. 73,046 at 32-212, quoting Evergreen Cemetery Association v. Commissioner,25 B.T.A. 544, 551-552 (1932).Emphasis in original.] See also Stringer v. Commissioner,84 T.C. 693, 705 (1985), affd. 789 F.2d 917↩ (4th Cir. 1986).
4. See generally Lewis v. Commissioner,T.C. Memo. 1980-334; Hendrich v. Commissioner,T.C. Memo. 1980-322; Oringderff v. Commissioner,T.C. Memo. 1979-93, affd. (10th Cir., Aug. 10, 1981, 48 AFTR 2d 81-5908, 81-2 USTC par. 9642); Meade v. Commissioner,T.C. Memo. 1973-46↩. 5. See also Oringderff v. Commissioner,T.C. Memo. 1979-93, affd. (10th Cir., Aug. 10, 1981, 48 AFTR 2d 81↩-5908, 81-2 USTC par. 9642).